**In the Matter of the Requested Extradition of Michele SINDONA by the Republic of Italy.**

**No. 76 Cr. Misc. 1 (p. 126).**

United States District Court, S. D. New York.

May 18, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y. by John J. Kenney, Asst. U. S. Atty., New York City, for petitioner.

Mudge, Rose, Guthrie & Alexander by John J. Kirby, Jr., Laurence B. Senn, Jr., Benjamin R. Idziak, New York City, Baer & McGoldrick, by Robert Kasanof, Dynda Andrews, New York City, for Michele Sindona.

## OPINION

GRIESA, District Judge.

The Republic of Italy applies for the extradition of Michele Sindona from the United States to Italy.

## I.

The proceedings on this application are pursuant to 18 U.S.C. § 3184,[1] which provides in essence that, where there is an extradition treaty between the United States and a foreign government, a judge or magistrate of a court of record in this country may, upon complaint made under oath charging a person with the commission of a crime within the foreign country listed in the treaty, issue a warrant for the arrest of the charged person. The statute further provides that the judge or magistrate will hold a hearing and, if he deems the evidence sufficient to sustain the charge, he will certify this conclusion to the Secretary of State, so that a warrant may issue for the surrender of the person for extradition under the treaty.

The Republic of Italy is represented in this matter by the United States Department of Justice. The applicable extradition treaty provides that legal officers of the United States shall assist Italy in extradition proceedings before United States judges and magistrates. I will frequently refer in this opinion to "the Government," meaning the United States Department of Justice representing the Republic of Italy.

A complaint was issued September 7, 1976, sworn to by John J. Kenney, Assistant United States Attorney for the Southern District of New York. The complaint alleges that Sindona committed the crime of "fraudulent bankruptcy" under Italian law, by unlawfully taking 180 billion lire (equal to about $225 million) from an Italian bank, Banca Privata Italiana, and its predeces-

sors, Banca Unione and Banca Privata Finanziaria, and by falsifying the books of those institutions. The complaint alleges that BPI was declared insolvent and a liquidator was appointed on September 29, 1974. The complaint alleges that the crime of fraudulent bankruptcy is among the offenses enumerated in the extradition treaty between the United States and Italy.

A warrant for Sindona's arrest was issued by this Court on September 7, 1976. Sindona was arrested in New York City and was subsequently released on bail pending the extradition hearing.

For the reasons hereafter set forth, the request of the Republic of Italy for the extradition of Sindona is granted.

## II.

Sindona is a 58-year old Italian businessman. He became vice president and a member of the board of directors of Banca Privata Finanziaria ("BPF") in 1960. He became president of that bank in September 1973. Sindona became vice president and a member of the board of directors of Banca Unione ("BU") in 1968. He ceased being a vice president of BU as of April 24, 1974, but continued thereafter as a director of that bank. Sindona owned 100% of the stock of BPF and 51% of the stock of BU.

As of August 1, 1974 BU and BPF merged. The merged entity was Banca Privata Italiana ("BPI").

It appears that Sindona was neither an officer nor a director of BPI. The record is

1. "§ 3184. Fugitives from foreign country to United States

    Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be

brought before such justice, judge, or magistrate to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

not entirely clear as to precisely how long Sindona remained with the predecessor entities—i. e., as a director of BU, and as president and a director of BPF. I will infer, for purposes of this opinion, that Sindona held these offices in BU and BPF until the date of the merger.

BPI was ordered into liquidation by a decree of the Italian Ministry of the Treasury dated September 27, 1974, and a liquidator was appointed. A judgment of the Civil and Criminal Court of Milan, Second Civil Division, dated October 15, 1974, declared BPI insolvent. This judgment of insolvency was affirmed by the Court of Appeal of Milan in July 1977, and was further affirmed by the Supreme Court of Italy on March 31, 1978.

A warrant for Sindona's arrest on criminal charges in Italy was issued October 4, 1974. A second arrest warrant was issued October 24, 1974. A third arrest warrant, the one referred to in the extradition request, was issued July 2, 1975.

Sindona could not be served in Italy with any of these arrest warrants. In 1974 he left Italy and has not returned to that country.

It appears that Sindona was tried in absentia in Italy for violating certain Italian bankruptcy regulations, was convicted on June 29, 1976, and was given a sentence of 3½ years in prison. Extradition is not being sought with respect to this conviction. As already described, the criminal charge for which extradition is requested is what is referred to as "fraudulent bankruptcy."

The request for Sindona's extradition was originally made by the Republic of Italy in a diplomatic note to the United States Department of State dated March 11, 1975. Apparently there was some problem which prevented the further processing of the request at that time. In a diplomatic note dated November 25, 1975 and a supplemental note dated December 2, 1975 the Italian government renewed the extradition request. On February 9, 1976 Lucy A. Hummer, an attorney-advisor for the State Department, certified that she had reviewed the documents submitted by the Republic of Italy and had found them in proper form as required by the extradition treaty. As already described, Assistant United States Attorney Kenney filed the complaint pursuant to 18 U.S.C. § 3184 on September 7, 1976.

### III.

The applicable treaty is entitled "Treaty on Extradition Between the United States of America and Italy." 26 U.S.T. 493, T.I. A.S. No. 8052. It was signed on January 18, 1973. Following proceedings in both countries regarding ratification, it became effective March 11, 1975. It will hereafter be referred to as "the Treaty."

Article II of the Treaty provides in pertinent part:

"Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided that these offenses are punishable by the laws of both Contracting Parties and subject to a term of imprisonment exceeding one year:

. . . . .

25. Fraudulent bankruptcy."

Article V provides:

"Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting Party."

Article XI provides in part:

"The request for extradition shall be made through the diplomatic channel.

The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting Party including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of the legal proceedings or the enforcement of the penalty for the offense.

When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge. or other judicial officer of the requesting Party and by such evidence as, according to the laws of the requested Party, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers."

### IV.

As indicated in the quoted material, the Treaty provides for extradition for the crime of "fraudulent bankruptcy." The Government has submitted the texts of the Italian laws relating to fraudulent bankruptcy, which will be discussed in detail hereafter.

It is a requirement of the Treaty (Article II) and of international law that the offense for which extradition is sought must be considered a crime by both countries. *Collins v. Loisel*, 259 U.S. 309, 311, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Shapiro v. Ferrandina*, 478 F.2d 894, 906 n. 12 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). In this regard, it is not necessary that the name by which the crime is described in the two countries be the same, or that the pertinent statutes of the two countries be identical in their description of the elements of the particular offenses and penalties therefor. It is enough if the particular act charged is criminal in both jurisdictions. *Collins v. Loisel, supra*, 259 U.S. at 312, 42 S.Ct. 469; *Shapiro v. Ferrandina, supra*, 478 F.2d at 907–08.

Both Articles V and XI embody the concept, familiar in extradition cases, that evidence must be presented sufficient to justify the accused person's arrest and committal for trial under the procedures applicable in the requested nation. The authorities are clear that, in the United States, this means that the requesting nation must produce sufficient evidence to show probable cause that the extraditee has committed the crime of which he is accused. *Collins v. Loisel, supra*, 259 U.S. at 316, 42 S.Ct. 469; *Shapiro v. Ferrandina, supra*, 478 F.2d at 905, 907; *Greci v. Birknes*, 527 F.2d 956, 958 n. 2 (1st Cir. 1976).

### V.

The Government has provided both the Italian original and an English translation of the Italian laws relied on regarding the criminal charge against Sindona. These provisions are contained in the Royal Decree of March 26, 1942, No. 267, which deals with bankruptcy, arrangements with creditors, receiverships, and forced administrative liquidations. It is apparently proper to refer to this decree as the Italian Bankruptcy Law. The relevant provisions of the Bankruptcy Law are Articles 216, 219 and 223, which in pertinent part read:

"216. (Fraudulent bankruptcy). A businessman is punished with imprisonment of from three to ten years, if declared to be bankrupt, when he:

1) has distracted, hidden, dissimulated, destroyed or dissipated all or part of his assets or, with the intent of damaging his creditors,· has alleged or acknowledged the existence of nonexisting debts;

2) has subtracted, destroyed or falsified, wholly or partly, with the intent of procuring for himself or others an unjust profit or of damaging his creditors, the books and other accounting records or has so kept them as to make it impossible to reconstruct the assets or the transactions of the business."

\*  \*  \*  \*  \*  \*

"219. (Aggravating circumstances and extenuating circumstances). In those cases where the acts contemplated by Articles 216, 217 and 218 [2] have caused substantial financial losses, the penalties provided by such articles are increased by

---

**2.** Articles 217 and 218 are not relevant to the present proceeding. Article 217 relates to the crime "simple bankruptcy." The warrant for Sindona's arrest dated July 2, 1975 included a charge under Article 217. However, simple bankruptcy is not an offense covered by the extradition treaty, and extradition is not being sought for this offense.

up to one half. The penalties provided in the above mentioned articles are increased:

1) if the offender has committed several acts from among those contemplated by any of the articles mentioned;

2) if the offender was prohibited by law from engaging in a commercial enterprise.

In those cases where the acts contemplated in the first subsection have caused particularly small financial losses, the penalties are reduced by up to one-third."

\* \* \* \* \* \*

"223. (Acts of fraudulent bankruptcy). The penalties provided in Article 216 are applied to the directors, the general managers, the auditors and the liquidators of companies which are declared to be bankrupt, who have committed any of the acts contemplated in the aforesaid article.

The penalty provided by the first subsection of Article 216 is applied to the aforesaid persons when:

1) they have committed any of the acts contemplated in Articles 2621, 2622, 2623, 2628, 2630 subsection 1, of the Civil Code;

2) they have caused by fraud or by the effects of fraudulent transactions the bankruptcy of the company.

In addition, the provision of the last subsection of Article 216 is applicable in all cases."

## VI.

Article 216, insofar as relevant here, applies to a businessman who is declared bankrupt and who has committed certain acts prior thereto such as dissipating his assets and falsifying his books. Article 223 provides that, under certain conditions, the provisions of Article 216 apply to a director of a company which is declared to be bankrupt, where the director has committed any of the acts referred to in Article 216. In order for Sindona to be properly charged with the crime of fraudulent bankruptcy, the allegations against him must fit within Article 216, read in conjunction with Article 223.

An initial problem under Article 223 arises as to whether Sindona was a director of a company which was "declared to be bankrupt." Sindona was a director of both BU and BPF. Although these companies were the predecessors of the merged entity, BPI, Sindona did not become a director of BPI. It was BPI which was adjudged insolvent on October 15, 1974. Thus there is a question as to whether Sindona's directorships in the predecessor companies, BU and BPF, are sufficient to place him within the ambit of Article 223, when he was not actually a director of the merged entity, BPI.

Both the Government and Sindona have submitted affidavits from Italian lawyers on this question. Both of these lawyers agree essentially that if a director of a predecessor company commits illegal acts which cause the insolvency of the successor company, then that director may be prosecuted under Article 223, provided that other conditions are fulfilled (Viola aff. January 16, 1978; La Villa aff. January 30, 1978).

A further question in this connection is whether BPI was "declared to be bankrupt" within the meaning of Article 223. Both Article 223 and Article 216 contain the phrase "declared to be bankrupt," which is crucial to the application of these provisions. The Italian phrase in Article 223 is "dichiarate fallite." The Italian phrase in Article 216 is "dichiarato fallito."

The judgment of the Milan court of October 15, 1974 did not literally declare BPI bankrupt, but declared BPI to be insolvent. The Italian phrase used in the judgment is:

". . . dichiare lo stato di insolvenza della S.p.A. BANCA PRIVATA ITALIANA . . . ."

The translation of this phrase is:

". . . hereby declares the state of insolvency of the Banca Privata Italiana. . . ."

The affidavit submitted by the Government states that "stato di insolvenza" is the equivalent of "fallimento"—that is, that "state of insolvency" is the equivalent of "bankruptcy" (Viola aff. January 16, 1978).

The judgment of insolvency of the Milan court was rendered under Articles 195 and 202 of the Italian Bankruptcy Law, Royal Decree of March 16, 1942, No. 267. Another section of the Bankruptcy Law, Article 203 (see Viola aff. January 16, 1978), provides that where a state of insolvency has been adjudged under Articles 195 and 202, the provisions of Articles 216 and 223 shall apply. The pertinent language of Article 203 is:

"Once the state of insolvency has been ascertained pursuant to Arts. 195 and 202, the provisions of Title II, Chapter III, Section III shall apply, effective from the date of the Liquidation Order, also in respect of unlimited liability partners.

The provisions of Arts. 216 to 219 and 223 to 225 shall also apply in respect of the above-mentioned partners as well as of the directors, general managers, liquidators and members of the supervisory bodies."

I conclude that the judgment of "insolvenza" of October 15, 1974 falls within the meaning of the phrases "dichiarato fallito" and "dicharate fallite" in Articles 216 and 223.

There is a different, but somewhat related, problem under certain other language of Article 223. I refer to the following language:

"The penalty provided by the first subsection of Article 216 is applied to the aforesaid persons when:

1) they have committed any of the acts contemplated in Articles 2621, 2622, 2623, 2628, 2630 subsection 1, of the Civil Code;

2) they have caused by fraud or by the effects of fraudulent transactions the bankruptcy of the company.

In addition, the provision of the last subsection [subsection (2)] of Article 216 is applicable in all cases."

Subsection (1) of Article 216 deals with dissipation of assets and similar acts. Subsection (2) of Article 216 deals with falsification of records. The Republic of Italy's charges of fraudulent bankruptcy against Sindona include allegations under both subsections of Article 216.

The question has been raised whether Sindona can be charged with violation of subsection (1) of Article 216 without being charged with violation of the articles of the civil code referred to in subsection (1) of Article 223. Although it might be argued that the arrest warrant and the evidence justify a charge under Article 2621 of the civil code (see Viola aff. April 20, 1978), the Government has not placed any real reliance on such a theory. The Government's argument is that Sindona can be charged under subsection (1) of Article 216 without any charge of violation of the articles of the civil code referred to in Article 223. In other words, the Government interprets subsections (1) and (2) of Article 223 as reading in the disjunctive, and argues that it is sufficient if the evidence shows that Sindona caused the bankruptcy of BPI by fraud or the effects of fraudulent transactions within the meaning of subsection (2). The affidavit submitted by the Government supports this interpretation (Viola aff. April 20, 1978), and I find this interpretation entirely reasonable.

## VII.

The following is a summary of the allegations of the Republic of Italy against Sindona, which are said to constitute the crime of fraudulent bankruptcy.

It is alleged that Sindona violated Article 223 and subsection (1) of Article 216, in that Sindona, while a director of BU and BPF:

(a) Distracted, hid and dissipated assets of BU and BPF, by improperly transferring funds to Sindona companies outside of Italy through foreign banks by means of so-called fiduciary deposits;

(b) Distracted, hid and dissipated assets of BU and BPF by improper foreign exchange trading, resulting in large losses to BU and BPF, which were disguised on the books of BU and BPF as assets;

(c) Acknowledged the existence of nonexistent debts with the intent of damaging creditors, by having certain debts owed by Sindona companies to BU and BPF transferred to other Sindona compa-

nies of no substance so that the debts could not be collected.

It is alleged that the insolvency or bankruptcy of BPI was caused by the effects of these fraudulent transactions of Sindona.

It is alleged that Sindona violated Article 223 and subsection (2) of Article 216, in that all of the above transactions were accompanied by falsification of the books of BU and BPF and failure to make entries necessary to show the true nature of the transactions.

## VIII.

The evidence presented by the Italian government in support of the extradition request consists mainly of a report of bank examiners with respect to BU, a report of the liquidator of BPI, and certain depositions. These are referred to as "Enclosures"—that is, enclosures to certificates of the Italian Ministry of Grace and Justice and the American Chargé d'Affaires in Rome. The transmission of materials which was made in November 1975 included the request for extradition, signed by Guido Viola, Assistant Public Prosecutor of Milan, dated July 7, 1975; the text of various Italian statutes; and seven [3] numbered Enclosures as follows:

| | |
|---|---|
| Enclosure 1 | Warrant of Arrest of the Court of Milan, signed by Dr. Ovili Urbisci, dated July 2, 1975; |
| Enclosure 2 | Deposition of Nicola Biase, April 18, 1975; |
| Enclosure 4 | Report of Bank Examiners of Bank of Italy, with respect to Banca Unione; |
| Enclosure 5 | Deposition of Silvano Pontello, February 11, 1975; |
| Enclosure 6 | Deposition and report of Giorgio Ambrosoli, liquidator of BPI, June 11, 1975; |
| Enclosure 7 | Deposition of Raffaele Bonacossa, June 20, 1975; |
| Enclosure 8 | Photograph of Michele Sindona. |

In August, September and October 1976 a total of thirteen more Enclosures were transmitted by the Italian government. These are numbered Enclosures 9–21.

There were proceedings, commencing with a motion of Sindona filed September 22, 1976, in which Sindona made certain objections to the documentary submissions, and the Government took certain steps to cure some of the objections.

At a hearing on November 10, 1977 I announced my rulings on the Sindona objections. I sustained the objections to Enclosures 10–17 and to a small portion of Enclosure 6. Otherwise, I overruled the objections and admitted the documents. The major problem raised by the Sindona objections related to whether there had been compliance with Article XI of the Treaty with respect to the depositions. The relevant portion of Article XI provides:

"The warrant of arrest and deposition or other evidence, given under oath, and the judicial documents establishing the existence of the conviction, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Italy, they bear the signature or are accompanied by the attestation of a judge, magistrate or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Italy, or when, in the case of a request emanating from the United States, they are signed by or certified by a judge, magistrate or officer of the United States and they are sealed by the official seal of the Department of State. Any deposition or other evidence which has not been given under oath but which otherwise meets the requirements set forth in this paragraph shall be admitted in evidence as a deposition or evidence given under oath when there is an indication that the person, prior to deposing before the judicial authorities of the requesting Party, was informed by those authorities of the penal sanctions to which he would be subject in the case of false or incomplete statements."

---

**3.** The list below does not include an Enclosure 3. It appears that there was originally an Enclosure 3. However, this was withdrawn by the Italian government.

Sindona contended that certain of the depositions were neither given under oath nor with notice of the penal sanctions to which the deponent would be subject in case of false or incomplete statements. The problem was that, at the time the depositions were taken, certain of the deponents were accused of crimes. Such accused persons, under Italian law, apparently cannot be punished for making false or incomplete statements, except as to their identity and status. Thus they could not be informed of penal sanctions in the case of false or incomplete statements made in the depositions. The First Circuit has held in a case involving this Treaty, that depositions taken in Italy of accused persons cannot be admitted in an extradition hearing in the United States. *Greci v. Birknes*, 527 F.2d 956, 959–60 (1st Cir. 1976). I have followed this decision in sustaining the objections to Enclosures 10–17 and a portion of Enclosure 6.

As a result of my rulings, the request for extradition, the text of the Italian laws, and Enclosures 1, 2 and 4–8, except for the portion of Enclosure 6, were admitted into evidence. Enclosures 9, 18, 20 and 21 were also admitted into evidence. These showed that appropriate warnings of penal sanctions had been given with respect to certain other enclosures. In addition, Enclosure 9 contains certain statements by Guido Viola regarding Sindona's positions at BU and BPF; Enclosure 19 contains certain statements of Viola regarding the applicable Italian statute of limitations; and Enclosure 21 contains certain statements by a bank examiner, Vincenzo Desario.

## IX.

The following is a summary of the evidence against Sindona.

As already described, the Italian Ministry of the Treasury entered an order on September 27, 1974 directing the liquidation of BPI. Giorgio Ambrosoli was appointed liquidator, and assumed his functions on September 29, 1974. He made his "first report" to the Public Prosecutor of Milan on March 21, 1975. The report is contained in Enclosure 6.

During the period July 1, 1974 to October 1, 1974 bank examiners from the Bank of Italy made an inspection of BU. The team of inspectors was headed by Vincenzo Desario. One purpose of the examination was to determine the position of BU as of June 28, 1974. The inspectors rendered a lengthy report, discussing the position of BU as of that date, and providing a great amount of other information. This report is Enclosure 4.

I should emphasize that the bank examiners' report (Encl. 4) relates only to BU. A bank examiners' report regarding BPF was originally Enclosure 3, but was withdrawn from the documents submitted on the extradition request. The Government states that Enclosure 3 would be cumulative. As already stated, the liquidator's report refers to the merged entity, BPI.

The bank examiners found that the accounting records of BU, although formally well organized, were of little or no reliability. The examiners found that there were a variety of devices, of the greatest complexity, used at BU to conceal the true nature and purpose of various transactions. This involved, among other things, the recording of fictitious foreign exchange transactions, the failure to record other foreign exchange transactions, various techniques of fragmenting transactions within the bank so that the participants would not discover what was actually occurring, and the establishment of fictitious security to support credits granted to Sindona entities (Encl. 4 pp. 5–6).[4] The report stated, on the basis of a lengthy analysis, that the "official balance sheet" of BU for December 31, 1973 was false because of numerous substantial transactions which were not reflected in that balance sheet and were only

---

4. In the case of Enclosures 1–8, the initial English translations were superseded by later, more accurate translations. The references in this opinion, in the case of Enclosures 1–8, will be to the second set of translations—sometimes referred to as "AET", standing for "Additional English Translations."

reflected in "secret accounting" (Encl. 4 pp. 43–54, 85–90).

The bank examiners' report contains an analysis of the proceedings of BU's board of directors, executive committee, and "board of auditors," and concludes that these bodies were the mere tools of Sindona and his collaborator, Carlo Bordoni, Managing Director of BU (Encl. 4 pp. 21–24).

The bank examiners' report and the liquidator's report discuss in detail the so-called "fiduciary deposit" transactions, as revealed by their investigations, which occurred beginning in the last half of 1973 (Encl. 4 pp. 16, 55–57, 60; Encl. 6 pp. 1, 5–9). The transactions complained of were as follows. Funds of BU and BPF would be deposited with certain foreign banks, principally Amincor Bank of Zurich. These banks would be instructed to credit the funds to beneficiaries which were foreign companies controlled by Sindona. Although in theory these transactions might have been considered as loans by BU and BPF to the Sindona companies, the reports state that there was no valid documentation in the books and records of BU and BPF, and that all trace of the true beneficiaries of the deposits was removed from the banks' documentation (Encl. 4 p. 59; Encl. 6 pp. 1, 6). In any event, the bank examiners' report states that these "financings" were granted without approval by the competent corporate organs, and that in most cases they were in excess of legal lending limits and in violation of the Italian Banking Law (Encl. 4 p. 16). Also, the import of both the examiners' report and the liquidator's report is that Sindona never intended to repay the funds transferred by fiduciary deposits, or at least soon decided that there would be no repayment.

In this connection, both reports state that, commencing in early 1974, the transactions were altered so that "bridge companies" were substituted on the fiduciary accounts with the foreign banks. It is alleged that these bridge companies had no assets. Thus, if BU or BPF, or the foreign bank, sought to look to the beneficiary of the fiduciary accounts to repay the "financings," the banks would be faced with a company which had not received the cash from the financings and which had no other assets to repay these advances (Encl. 4 p. 56; Encl. 6 p. 5).

The reports name certain of the Sindona companies which were beneficiaries of these transfers of funds—Edilcentro, Nassau; Edilcentro, Cayman; Capisec S.A.; and Alifin S.A. One of the "bridge companies" was Arana Investment S.A.—Panama (Encl. 4 p. 56; Encl. 6 p. 1).

Both the bank examiners' report and the liquidator's report discuss what is said to have been improper foreign exchange trading, resulting in large losses to BU, BPF and the merged entity BPI. . The examiners' report states that the foreign exchange trading transactions of BU were mainly carried out by Carlo Bordoni. However, the report indicates clearly that Sindona was directing the scheme. The examiners' report has a complex description of various types of foreign exchange trading transactions entered into by BU and accounting devices used to conceal such losses and make them appear as assets in the form of deposits at foreign banks, principally Amincor of Zurich. The report also describes various accounting devices used to create fictitious assets in the December 31, 1973 balance sheet through simulated foreign exchange transactions. The liquidator's report states that there were foreign exchange contracts at prices entirely different from those current at the time, and indicates that some of the foreign exchange transactions appear to have been made with the specific purpose of having BU and BPF lose to some other party (Encl. 4 pp. 83–94; Encl. 6 pp. 9–10).

The bank examiners' report has a detailed description of losses said to have been suffered by BU from various causes "as of June 28, 1974." The total of the losses described is 111 billion lire (Encl. 4 p. 84). Using an exchange rate of 650 lire to the dollar, this would be equal to about $171

million.[5] The report states that 88.6 billion lire of this loss (equal to $136 million) was caused by the fiduciary deposit transactions in favor of the Sindona companies (Encl. 4 pp. 60, 83). The report lists losses of over 30 billion lire (equal to $46 million) on certain foreign exchange transactions as of June 28, 1974 (Encl. 4 p. 83). Thus, according to the examiners' report, the losses of BU as of June 28, 1974 from the fiduciary deposit and foreign exchange transactions complained of totalled about 118 billion lire, or $182 million.

The liquidator's report describes deficit figures for BPI, which are apparently as of September 27, 1974, the time when the liquidator was appointed.[6] This liquidator states that BPI had assets of about 280 billion lire and liabilities of about 480 billion lire, giving a deficit or negative balance of 200 billion lire (Encl. 6 p. 4). The liquidator voices the opinion that the principal reason for BPI having this negative balance was the fiduciary deposit transactions for the benefit of the Sindona companies (Encl. 6 pp. 4–5), and that another important cause was the improper foreign exchange trading transactions (Encl. 4 pp. 9–10).

Further evidence on these matters is supplied in the depositions of Nicola Biase (Enclosure 2), Silvano Pontello (Enclosure 5), and Raffaele Bonacossa (Enclosure 7). These three men were employees of BPF. It should be noted that, beginning at least in July 1974, BU and BPF were preparing for their merger, and their operations were united to some extent. Thus employees of one bank could observe events in the other bank.

Biase's deposition states that he started working in Milan for BPF on July 2, 1974. Biase gave instructions to have a general inventory taken of the entire foreign department of BU and BPF. He noted that certain payments were required to be made abroad and there appeared to be a shortage of available foreign exchange. Biase therefore decided to call all deposits which BU and BPF had in foreign banks, which were subject to repayment on 48-hours' notice, and also decided to call all 48-hour loans granted to foreign banks. According to Biase, the records of BU and BPF showed substantial deposits with foreign banks and loans to foreign banks, which were available for call by BU and BPF. (Encl. 2 pp. 2–3).

In the course of attempting to call in these supposed assets, Biase spoke to A. Marca, General Manager of Amincor Bank of Zurich. Marca told Biase that there were no regular deposits with his bank, but only fiduciary deposits, under which funds deposited with Amincor by BU and BPF had been diverted to other companies pursuant to "underlying fiduciary agreements" (Encl. 2 pp. 3–4).

Biase's deposition states that he immediately gave orders to the employees of the foreign departments of BU and BPF, and to other employees in the banks, to advise him of all fiduciary deposits opened by BU and BPF (Encl. 2 p. 4). The fiduciary deposit arrangements were not disclosed by the regular records of BU and BPF, according to Biase's testimony. Biase's initial efforts to uncover the facts were obstructed. He then threatened certain employees with dismissal, after which they supplied him with certain information in their possession for the purpose of reconstructing and identifying the fiduciary deposits (Encl. 2 p. 4).

5. It appears that in 1974 the exchange rate was in the range 625–665 lire to the dollar. The bank examiners' report at one point uses a rate of 647.625 (Encl. 4 p. 55). The complaint uses a rate of 800. In this opinion an exchange rate of 650 will be used.

6. The liquidator's report is undated. However, it appears that it was issued in early 1975. The liquidator's report states that the resigning board of trustees of BPI (who apparently resigned at the time of the judgment of insolvency) delivered on October 25, 1974 a report to the liquidator as to the position of BPI as of September 27. However, that report contained so many reservations that it was substantially unreliable. The liquidator then worked to develop his own revised statement of position for BPI as of September 27, 1974. The liquidator states that his work in this regard was far from complete even six months after he had started the project (Encl. 6 p. 13).

Biase states that the employees whom he questioned in the foreign departments of BU and BPF did not possess copies of the fiduciary agreements. However, certain employees had schedules of deposits in foreign banks, which bore code numbers for the fiduciary deposits, which code numbers corresponded to cards kept by these employees indicating the beneficiaries of the fiduciary deposits. These employees advised Biase that the beneficiaries of the deposits had been Capisec and other companies in the Sindona Group (Encl. 2 p. 5).

Biase also obtained information about the time contracts relating to foreign exchange trading, which Biase states had been made by BU and BPF but not recorded. The foreign department employees said that certain foreign exchange trading operations "on behalf of Romitex" were made "in the interest of the Sindona group." Biase states that foreign exchange losses were camouflaged as deposits in foreign banks, so that an actual loss "became a fictitious asset for the bank" (Encl. 2 pp. 3–5).

Biase states that he went to Sindona's office at BPI and "faced him with the results of my investigation." According to Biase, Sindona became white as a sheet and said nothing during a few minutes of embarrassing silence, after which Sindona told Biase not to be concerned because he had negotiated a loan of $100 million from the Bank of Rome, which he would use to repay partially his exposure to the Milan banks. This meeting is said to have occurred a few days prior to July 12, 1974. Biase states that he told Sindona that he was resigning from his employment (Encl. 2 pp. 5–6).

Biase further states that he transmitted the results of his investigation to Dr. Fignon of the Bank of Rome and also to Dr. Taverna of the Bank of Italy about July 12 (Encl. 2 p. 6).

Biase states that he concluded that the Sindona group was liable to BU and BPF for $221 million (equal to 143.6 billion lire) on account of funds passing to companies in the Sindona group and the "refinancing of previously incurred foreign exchange losses." Biase also concluded that BU and BPF

incurred losses of 46 billion lire (equal to $70 million) as of July 10, 1974, on account of other foreign exchange contracts which were not recorded in the books of the banks.

Biase states that, in his investigation, he discovered evidence of a transfer of 220 million Swiss francs from BPF to BU. This amount represented profits made by BPF on foreign exchange transactions as of June 26, 1974. These funds, according to Biase, were subsequently diverted to Amincor in Zurich and lost track of (Encl. 2 p. 9).

Biase states that he questioned certain of the lower level employees, such as Bonacossa, as to who instructed them with respect to fiduciary deposit transactions. They said that their instructions were received from Dr. Clerici, the managing director of BPF. Biase questioned Clerici, who answered evasively, and said that he had received his instructions "from on high," indicating Sindona (Encl. 2 p. 9).

Bonacossa, an employee of BPF, stated in his deposition that in early in 1974 Clerici told him that a company named Arana had been incorporated to engage in certain financial operations. Bonacossa stated that BU or BPF would make a deposit with a foreign bank such as Amincor and instruct it to credit the funds to Arana. Arana would then transfer the funds to other companies such as Capisec (Encl. 7).

Pontello, another employee of BPF, describes in his deposition an incident in early July 1974, when Sindona dictated to Pontello a balance sheet showing the "global assets and liabilities of the Sindona group as of June 1974" (Encl. 5 p. 7). Sindona told Pontello that this was extremely confidential, although Sindona's son-in-law, Magnoni, later said that the statement was delivered to the Governor of the Bank of Italy (Encl. 5 pp. 7–8). Pontello stated that, prior to this incident, he had understood that the Sindona Group had "autofinanced itself" by the device of the fiduciary deposit transaction. Pontello stated that he did not know, prior to Sindona's dictating the financial statement, how much such "autofinancings" amounted to, and was shocked to

learn from Sindona that they were in the amount evidenced in the statement (Encl. 5 p. 10).

The statement itself, a copy of which is attached to the Pontello deposition, is somewhat cryptic. According to Pontello, the section headed "Liabilities" includes the amounts withdrawn from BU and BPF by means of fiduciary deposit transactions for the benefit of the Sindona Group (Encl. 5 p. 9). The total of three items listing liability to banks is 133.7 billion lire or $205.7 million.

As already described, the examination of BU by the Bank of Italy examiners commenced July 1, 1974. What occasioned this examination is not entirely clear. According to the examiners' report, as soon as the examination commenced, alarming rumors regarding BU appeared in the press, which generated a substantial withdrawal of funds by depositors, including other banks. Approximately 40 billion lire was withdrawn from BU during the period July 1–15 (Encl. 4 p. 4). The July liquidity problems were covered by loans obtained through the Bank of Rome, which intervened in, or entirely took over, the management of BU and BPF commencing the first part of July. A more serious demand for withdrawals occurred beginning September 13. By now BU and BPF had merged and become BPI. A total of 219 billion lire was withdrawn in the period September 13–27. At that point the liquidation of BPI was ordered (Encl. 4 p. 5). During this entire time the bank examiners were carrying out their inspection of the affairs of BU, and were presumably carrying out an inspection of BPF. Their inspection of BU was completed October 11, 1974. On October 15 BPI was adjudged insolvent.

As already described, the bank examiners ascertained that certain large losses had been sustained by BU, resulting largely from the alleged improper fiduciary deposit transactions and foreign currency trading. The liquidator estimated that there was a large deficit or negative balance at BPI as of the date of the liquidation order (September 27, 1974) and prior thereto, mainly caused by the fiduciary deposit and foreign currency trading problems.

The liquidator's report is to the effect that the losses and deficits of BU, BPF and BPI, created a situation in which these banks could not meet the withdrawal requests from their clients without the extraordinary subsidies from the Bank of Rome. Both the liquidator's report and the examiners' report go on to state that even with the subsidies, BPI was ultimately unable to cope with the withdrawal problem. According to this evidence, this chain of circumstances led to the appointment of the liquidator. After both the liquidator and the bank examiners had ascertained the "gravity of the negative balance between assets and liabilities," the liquidator requested the court to declare BPI insolvent, which was done (Encl. 4 p. 5; Encl. 6 pp. 10–11).

It should be noted that the liquidator states the view that the devices used for the fiduciary deposit transactions—with the substitution of the "bridge companies"—was to prevent bankruptcy authorities from discovering the true beneficiaries of the diverted funds. The liquidator expressed the opinion that during the first months of 1974 Sindona and his associates intentionally operated BU and BPF in contemplation of bankruptcy (Encl. 6 pp. 6–7, 9).

X.

Sindona has argued from the start of these proceedings that he is entitled to a hearing, in which he should be allowed to offer both testimony and documentary evidence on various issues, including the issue of whether he engaged in any criminal diversion of funds from BU and BPF or any falsification of bank records. Sindona admits that there were substantial transfers of funds from BU and BPF to his companies during the early months of 1974, but contends that they were duly authorized, fully secured loans. Sindona further contends that these transfers of funds did not cause the ultimate insolvency of BPI, but that such insolvency was caused by the heavy depositor withdrawals from BU, BPF

and BPI; and that, as far as any transfers of funds from BU and BPF in the early part of 1974 are concerned, he in effect restored these funds by arranging for loans from the Bank of Rome in the summer of 1974. Sindona proposes that the hearing should include an opportunity for him to offer evidence on the issue of what caused the insolvency of BPI.

■ An accused person's right to produce evidence at an extradition hearing is limited. The rule is that the accused has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility. On the other hand, the accused has the right to introduce evidence which is "explanatory" of the demanding country's proof. The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request. *Collins v. Loisel*, 259 U.S. 309, 315–17, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964).

The distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence," the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits. The Supreme Court has twice cited with approval a district court case which aptly summarizes the relevant considerations. The Supreme Court decisions are *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922), and *Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). The district court opinion is *In re Wadge*, 15 F.

864, 866 (S.D.N.Y.1883), in which the court dealt with the argument of an extraditee that he should be given an extensive hearing in the extradition proceedings:

"If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties."

Sindona has made an extensive offer of proof with regard to the alleged exculpatory evidence. This offer of proof is set forth in certain of the briefs filed by Sindona, and was discussed at greater length by Sindona's attorney at hearings held in January 1978.

Sindona contends that during the period July through December 1973 various non-Italian investors were making deposits of funds in order to purchase shares of stock of a company called Finambro; and that it was proposed that Finambro would use these funds to purchase shares of another company—Societa Generale Immobiliare ("SGI"), which was a real estate company in which Sindona was involved. Sindona contends that the foreign investors, in order to protect their anonymity, deposited these funds with Capisec and other Sindona entities—these other entities being collectively referred to as "SAS." Sindona argues that Capisec and SAS paid the funds—totalling 133 billion lire—to Finambro, and that in addition Finambro borrowed 63 billion lire

from BU and BPF, giving Finambro a total of 196 billion lire, with which Finambro purchased 229 million shares of SGI. All these shares, having an alleged value as of December 31, 1973 of 196 billion lire, were pledged, according to Sindona, to BU and BPF, under contracts of "riporto," as security for the 63 billion lire loan.

Sindona contends that, although the investors expected to receive shares in Finambro, such shares could not be issued until the Interministerial Committee on Credit and Savings had approved a capital increase of Finambro, but that the Minister of the Treasury, Ugo La Malfa, failed to convene the Interministerial Committee, thus preventing any action on the proposed Finambro capital increase, and leading to requests for withdrawals of funds on the part of investors who were not receiving Finambro shares. Sindona argues that he proposed to have Finambro sell the SGI shares to a wealthy Italian woman, Anna Bonomi, for 1000 lire per share, but that Guido Carli, Governor of the Bank of Italy, persuaded Sindona not to sell the shares, assuring Sindona that the proposed capital increase of Finambro would be approved. According to Sindona, Carli suggested borrowing money from BU and BPF, secured by the SGI shares, in order to repay the investors—the hope being that funds from investors would flow in again to Finambro once the capital increase had been approved.

It should be recalled that the basic charge of the Italian government against Sindona with respect to the fiduciary deposits is that in late 1973 and through the first six months of 1974 Sindona arranged the transfer of substantial funds from BU and BPF to foreign banks for the benefit of Capisec and other Sindona entities, and that after these entities had received the funds, "bridge companies" such as Arana, having no funds, were substituted as the "beneficiaries" with the intent that the companies which had actually received funds would be out of reach.

Sindona concedes that during the period January through May 1974 he arranged to have BU and BPF transfer about 130 billion lire (equal to $200 million) through foreign banks, to bridge companies such as Arana, and then to other Sindona companies such as Capisec and SAS, and that these transactions were carried out by means of fiduciary deposits with the foreign banks. However, Sindona makes three basic contentions, which are said to indicate that the transfers of funds were lawful, rather than criminal diversions of bank assets as the Italian government charges. These three contentions are:

(1) That the transfers of 130 billion lire were regularly authorized loans by BU and BPF to Capisec and the SAS entities;

(2) That Capisec and SAS used the funds to repay investors who had made deposits in order to obtain Finambro shares;

(3) That these loans were fully secured by SGI shares pledged with the banks.

With respect to the latter argument Sindona contends, as already described, that the SGI shares which had been pledged to BU and BPF for the loan of 63 billion lire were actually worth 196 billion lire, thus giving an "excess collateral" of about 133 billion lire. Sindona contends that this 133 billion lire worth of SGI shares was collateral for the 130 billion lire in "loans" to Capisec and the SAS entities.

Sindona argues that, following these transfers of 130 billion lire to Capisec and the SAS entities, BU and BPF were perfectly solvent because they held ample collateral, and that these transactions did not lead to the insolvency of BPI, but that BPI's insolvency was caused by runs of depositor withdrawals, which had nothing to do with the payments of funds to Capisec and the SAS entities.[7] Sindona contends that, in any event, he arranged to have the SGI shares transferred from his banks in order to obtain loans of $200 million from the Bank of Rome, which funds were made available to BU and BPF, and then BPI, to

7. Sindona contested the judgment of insolvency against BPI in the Italian courts. However, on March 31, 1978 the Supreme Court of Italy finally affirmed the judgment of insolvency.

attempt to remedy the liquidity crisis caused by depositor withdrawals. Sindona contends that through these loans from the Bank of Rome, he restored to BU, BPF and BPI the funds which had been transferred to Capisec and the SAS entities.

The evidence which Sindona has presented in support of this offer of proof consists of (1) nine affidavits filed on December 13, 1976, dealing mainly with the question of whether the charges against Sindona are politically motivated, but which also deal to some extent with Sindona's offer of proof described above; (2) certain depositions taken by the Italian government, and certain documents possessed by the Italian government, which Sindona claims to have obtained despite the fact that he contends that the Italian government deliberately withheld them from the submission on the extradition request.

As to live testimony, the only witness proposed in support of the offer of proof is Sindona himself. Sindona's attorneys have stated that Sindona will testify if it is agreed that his testimony can be used solely for the extradition hearing and cannot be used in connection with any investigation of charges against him in the United States (Minutes of January 12, 1978 pp. 214–16). On the latter point, Assistant United States Attorney Kenney has stated to the court that Sindona is presently under investigation in the United States in connection with Franklin New York Corporation and Talcott National Corporation, and has advised the court that the United States will not make any agreement limiting the use of any testimony given by Sindona on the extradition hearing.

## XI.

There are two basic questions which emerge at this point.

Is the evidence submitted by the Italian government sufficient to show probable cause that Sindona committed the crime of fraudulent bankruptcy?

What disposition should be made regarding Sindona's offer of proof?

I conclude that the evidence submitted by the Italian government is sufficient to establish probable cause that Sindona committed the crime of fraudulent bankruptcy, as defined by Articles 216 and 223 of the Italian Bankruptcy Law. I further conclude that Sindona's offer of exculpatory proof does not fall within the area of "explanatory" evidence contemplated by the cases. Sindona's contentions raise issues appropriate for presentation at a full trial in Italy; but they do not negate the probable cause showing of the Italian government, or in any way indicate that it would be unjust to require Sindona to respond to criminal charges in Italy. Indeed, Sindona's presentation reinforces my conclusion that there are sufficient grounds for proceeding with criminal charges in Italy.

In this connection, although technically I have before me the question of whether to entertain the evidence proffered by Sindona in support of his offer of proof, I have in fact reviewed the depositions and documents which have been submitted. For reasons to be described shortly, I find this evidence totally insufficient to support the offer of proof, much less to rebut the probable cause showing of the Italian government. As for the suggestion that I should require the Italian government to forward the alleged exculpatory materials in its possession, I reject this proposal on the ground that there is no sufficient indication of the existence of such exculpatory materials, and that in any event the great body of evidence undoubtedly located in Italy should be used at a trial there, not transported to the United States for an extradition hearing. Finally, as to the offer of Sindona's testimony, I decline to receive this testimony because, judging by the offer of proof, the most that such testimony could accomplish is to illustrate that there are issues appropriate for trial in Italy. I should note that I am not resting on any questions about Sindona's Fifth Amendment rights in connection with the criminal investigation in this country. I am assuming, for present purposes, that such problems did not stand in the way of Sindona's testifying in the extradition hearing.

Nevertheless, I am ruling that his testimony will not be received.

Some further explanation is in order regarding the conclusions just stated.

At various times during the hearings, I have discussed certain problems which I found in various portions of the evidence presented by the Italian government. Some of the statements in the evidence are of a conclusory nature, relying upon specific details and underlying documents not forwarded with the extradition application. The three most important items of evidence submitted by the Italian government—the bank examiners' report, the liquidator's report, and the Biase deposition—refer to numerous underlying documents, not submitted, which apparently contain a wealth of specific details about the questioned transactions.

However, after studying and restudying the Italian government's evidence, I have concluded that it amply supports the granting of the extradition request. In this regard, it is necessary to keep clearly in mind that this is an extradition hearing, not a trial on the merits. The Italian government was not required to present its entire case against Sindona, or all the available evidence against him, for the purpose of obtaining his extradition. Indeed, I conclude that, if the Italian government had forwarded the great bulk of documentary material underlying the reports and depositions, the submission would have gone far beyond what is appropriate for an extradition hearing.

I further conclude that the bank examiners' report and the liquidator's report are entitled to great weight, because they embody the results of what were obviously careful and thorough investigations. They are amply corroborated both by the detailed Biase deposition and the shorter, but crucial, depositions of Bonacossa and Pontello.

I therefore conclude that the evidence submitted by the Italian government indicates probable cause that Sindona committed the crime of fraudulent bankruptcy, as defined by Articles 216 and 223 of the Italian Bankruptcy Law in the following respects:

(1) That Sindona, while a director of BU and BPF, directed the unlawful transfer of large amounts of funds from those banks to Sindona companies outside of Italy, in violation of subsection (1) of Article 216;

(2) That Sindona directed improper foreign exchange trading by BU and BPF, resulting in large losses to those banks, in violation of subsection (1) of Article 216;

(3) That Sindona, with intent of damaging creditors, arranged to have certain debts owed by Sindona companies to BU and BPF transferred to other Sindona companies of no substance, thus creating "non-existent debts," in violation of subsection (1) of Article 216;

(4) That Sindona directed that the books and records of BU and BPF be falsified, and that essential entries and items of information be omitted from such books, in order to conceal the true nature of the above transactions, in violation of subsection (2) of Article 216.

I further find that the evidence of the government of Italy indicates probable cause to believe that the above fiduciary deposit and foreign exchange transactions, and falsification of books and records, caused the bankruptcy of BPI, for purposes of the application of Article 223. On this point, I am relying not only upon the opinions of the bank examiners and the liquidator (which opinions are informed and entitled to considerable weight), but also upon inferences which are logically drawn from the circumstances presented in the evidence. The bank examiners' report and the liquidator's report present a picture of massive diversions of the funds of BU and BPF by Sindona, who is said to have completely controlled the banks and to have created an administrative machinery designed to carry out his illegal purposes. The evidence further describes the most pervasive manipulation and falsification of the books and records of BU and BPF. If this evidence is correct, these banks were afflicted with such grievous problems that they could

hardly be expected to survive as viable entities, enjoying the necessary confidence of depositors and correspondent banks. All that kept BU and BPF alive, following the diversions and manipulation of books and records, was the temporary concealment of the facts about what had occurred.

I am, of course, not making any ruling on the merits of the criminal case on this question or any other. However, there is clearly a sufficient showing of probable cause that Sindona's activities caused the bankruptcy of BPI.

Sindona has submitted an affidavit from an Italian lawyer raising certain points about the interpretation of Article 216, which should be dealt with here (Pedrazzi aff. January 30, 1978). This lawyer argues:

(a) That, whereas the phrase "with the intent of damaging his creditors" appears to relate only to the part of subsection (1) dealing with the acknowledgment of non-existing debts, the intent of damaging creditors in fact applies to the other portions of subsection (1), dealing with distracting, hiding, dissimulating, destroying, or dissipating assets;

(b) That there can be a conviction for fraudulent bankruptcy only if there is a finding that the accused intended to "subtract assets from the apprehension of the bankruptcy organs acting in the interests of the bankrupt's creditors";

(c) That there can be a conviction under subsection (2), dealing with falsification of books and records, only if the purpose of the activity was to hinder the course of bankruptcy procedure, and only if it is impossible, from the entire records of the bankrupt, to reconstruct the assets and liabilities.

These interpretations go beyond the literal language of the statute. Moreover, as far as the second item, dealing with the requirement of proof that the activities were carried out in contemplation of bankruptcy, the lawyer concedes that the Italian courts are divided.

However, even if these interpretations are correct, the Italian government's evidence is sufficient for a probable cause showing. The evidence about the elaborate steps taken by Sindona to put the enormous fiduciary deposit transfers out of reach of BU and BPF, and the evidence about the maze of devices used to falsify the books and records, lead to a reasonable inference that one principal purpose of these activities was to prevent the funds involved from being recovered in the event of the bankruptcy of BU and BPF or a merged entity. It is impossible to conceive of a person of Sindona's experience and sophistication engaging in the activities which are alleged against him without having a view toward the possibility of bankruptcy. It is equally impossible to believe that the measures which were taken were not designed to mislead and hinder those who would be responsible for tracing and recovering assets in the event of bankruptcy.

As to the point about needing to examine the whole set of the records of the bankrupt, there is clearly a probable cause showing that such an examination was carried out through the combined efforts of the bank examiners and the liquidator and that the records of BU, BPF, and BPI were grossly false and incomplete.

With respect to Sindona's offer of proof, my conclusion is that it is basically "contradictory" rather than "explanatory" within the meaning of the applicable authorities. Sindona's argument that the fiduciary deposit transactions were proper secured loans for the purpose of repaying the investors who had deposited funds to purchase Finambro shares is flatly contradictory to the Italian government's evidence to the effect that these transactions were diversions of funds to Sindona companies, which were disguised on the books of BU and BPF as regular correspondent accounts with foreign banks, whereas the foreign banks had been given secret instructions by Sindona's accomplices to credit the funds to the Sindona entities. The Italian government's evidence is that Sindona never intended to repay these transfers, or at least soon decided to interpose the "bridge company" device in order to make it as difficult as possible for BU and BPF to obtain repay-

ment of the diverted funds. Sindona's argument, described above, is not "explanatory" within the meaning of the authorities. This argument, and any evidence in support thereof, are appropriate for presentation at a criminal trial in Italy, not at an extradition hearing.

A somewhat more difficult question on the existence of "explanatory" evidence is raised by Sindona's argument that any diversions of funds did not cause the insolvency of BPI, but that such insolvency was caused by other factors such as runs of depositor withdrawals. In this connection, there is the offer to show that Sindona in effect restored or repaid the fiduciary deposit transfers by arranging for $200 million in loans from the Bank of Rome in the summer of 1974. Sindona also contends that both the Bank of Italy and the Bank of Rome were fully apprised of all the difficulties at least by August 1, 1974, and that, instead of requesting criminal proceedings against Sindona or initiating insolvency proceedings against BU and BPF, the officials of the Bank of Italy and Bank of Rome continued to carry out various business negotiations with Sindona, and consented to the merger of BU and BPF. Sindona also points to the fact that for some time prior to the liquidation of BPI and its declaration of insolvency, BPI, and the predecessor banks, had been effectively under the management of the Bank of Rome.

It is true that Sindona's argument about causation raises a number of points, including the $200 million Bank of Rome loans, which are intended either to supplement, or place in a different context, the evidence submitted by the Italian government. However, the question of causation, whether viewed from the standpoint of the Italian government's charges or Sindona's defense, is a matter of circumstantial evidence, involving a complex chain of events and transactions occurring over many months. The Italian government has its evidence about the set of circumstances which it contends shows that Sindona caused the insolvency of BPI. Sindona suggests that there is a somewhat different set of circumstances favoring the view that his alleged wrongful acts did not cause the insolvency of BPI. The resolution of these conflicting positions will inevitably involve a thorough exploration of substantial bodies of evidence, both testimony and documents, which is appropriate for a full trial, not for an extradition hearing. In my view, Sindona's argument on causation is not truly "explanatory" within the meaning of the authorities.

Some further specific problems regarding Sindona's offer of proof should be discussed.

At the January hearings Sindona's attorney purported to explain the reason why the alleged repayments to the Finambro investors were made through Capisec and the SAS entities by means of the fiduciary deposits. This argument, of course, bears an important relation to the central question—whether the transfers to Capisec and SAS were illicit devices for diverting funds to Sindona, or whether the transfers were bona fide secured loans for the purpose of effecting repayments to the Finambro investors. Sindona's attorney, as part of the offer of proof, stated that the purpose of using Capisec and SAS was to protect the anonymity of the investors (Minutes January 9, 1978 pp. 174–75; January 12, 1978 p. 222). The court then asked a series of questions about why the anonymity of the investors could not be sufficiently protected by having foreign fiduciary accounts set up in *their* favor, without having Capisec and SAS as beneficiaries. At this point Sindona's attorney asked for a recess, after which he offered a revised explanation for the transfers to Capisec and SAS, not theretofore mentioned. This explanation was that Sindona hoped to conceal from the Interministerial Committee on Credit and Savings the fact of the repayments to the Finambro investors, so that this committee might still be induced to approve the Finambro capital increase (Minutes January 12, 1978 pp. 226 et seq.).

I conclude that Sindona, even in his offer of proof, has failed to present any consistent and plausible argument about the legitimacy of the fiduciary deposit transactions in favor of Capisec and the SAS entities.

At the January 1978 hearings Sindona's attorney also conceded for the first time that the so-called loans to Capisec, SAS, Arana, etc. were made to entities which, under the circumstances of the transactions, would have no ability to make repayment (Minutes January 8, 1978 p. 178). Of course, Sindona's argument is that the loans were fully secured by the SGI stock. However, some doubt is cast on the regularity of "loans" of $200 million, when they were made to admitted shell companies belonging to the person who controlled the banks.

Sindona argues that the documents submitted in this proceeding strongly support his defense and indicate that the Italian government must be concealing further evidence which would clearly exonerate him. Upon review of these documents, I find them more favorable to the Italian government's charges than to Sindona's defense.

These documents included a deposition of Giovan Battista Fignon taken by the Italian prosecuting authorities on May 7, 1975. In the summer of 1974, Fignon had represented the Bank of Rome in the management of BU and BPF, and then BPI, at the time of the advances by the Bank of Rome. By the time of the deposition, Fignon was an accused person. It is ironic that Sindona submits this and two other depositions of accused persons, whereas Sindona objected to the Government's submission of depositions of accused persons. In any event, the Fignon deposition does not appear to support Sindona on the essential points. For instance, Fignon speaks of transactions of BU and BPF which appeared to be debts from foreign banks, but were in reality "debts" of other organizations like Capisec involving fiduciary deposit transactions. Fignon states that none of the bank officers showed him documents indicating the name of the actual debtor on the fiduciary contracts, although certain information was given him by Biase. Fignon states that he attempted to ascertain if the "debts" could be collected from Capisec and the other recipients of the funds. He found that on the due dates of these "debts," they had not been paid, and they were uncollectable (Ex. E. pp. 3–4, 7).

As already noted, Sindona has argued that, in the summer of 1974, he arranged for loans of $200 million to be made by the Bank of Rome to assist BU and BPF, and then BPI, and that by means of these transactions he "repaid" the money which had been taken out of BU and BPF in the fiduciary deposit transactions.

The documents presented by Sindona in the extradition hearing do not support this argument. There is considerable discussion in the Sindona documents of the advances made in the summer of 1974 by the Bank of Rome, particularly in a letter dated August 29, 1974 from F. Ventriglia of the Bank of Rome to Guido Carli, Governor of the Bank of Italy (Ex. B). It appears that there was a United States currency advance of $100 million, secured by 100 million shares of SGI stock and 51% of the shares of BPI. There was another advance of 63.5 billion lire secured by 129 million shares of SGI. The latter advance would be equal to about $100 million. However, the Ventriglia letter in no way indicates that this $200 million was used to "repay" the alleged debts of Capisec and the SAS entities to BPI on the fiduciary deposit transactions. Indeed, the 63.5 billion lire advance was specifically used to repay the *original* loan made by the Milan banks to Finambro at the time Finambro purchased the SGI shares, a transaction earlier than, and different from, the fiduciary deposit transactions in question (Ex. B p. 6). The Ventriglia letter discusses what is termed "Negative imbalance between debits and credits towards companies it is believed belong to Sindona Group ($209 million)," or 136 billion lire, and losses on foreign exchange operations of 17.3 billion lire by BPI and its predecessor banks (Ex. B p. 7). The letter treats these amounts as part of a "burden" which the Bank of Rome would have to assume if it took over BPI. Clearly Ventriglia does not consider that the 136 billion lire imbalance from payments to the Sindona companies and the 17 billion lire loss on foreign exchange are repaid or covered by the $200 million advances by the Bank of Rome.

The Sindona documents indicate that during the summer of 1974 the Bank of Italy and the Bank of Rome were attempting to devise a means for saving BPI for the sake of the Italian banking system and its credibility at home and abroad. To some extent this involved negotiations with Sindona. Obviously no satisfactory plan was worked out. The problems at BPI were too serious, and the bank went into liquidation.

Both the Italian government's evidence and the Sindona documents indicate that information about the true state of affairs at BU, BPF and BPI, and information about the nature of Sindona's activities, were developed gradually and with difficulty over a period of many months, starting about July 1974 with the arrival of the Bank of Italy examiners and representatives of the Bank of Rome.

## XIII.

■ Earlier in this opinion, I described the provision of the treaty (Article II) and the authorities under general international law to the effect that the offense for which extradition is sought must be considered a crime in both the requesting and requested countries.

The acts which are charged by the Republic of Italy to have been committed by Sindona are criminal acts under United States law. It is a crime for a director of a national bank to embezzle, abstract, purloin or willfully misapply funds of such a bank. 18 U.S.C. § 656. It is a crime to falsify the books or records of any lending institution authorized or acting under the laws of the United States, with intent to defraud such institution. 18 U.S.C. § 1006. Finally, it is a crime fraudulently to transfer property of a corporation, or to falsify corporate documents, in contemplation of a bankruptcy proceeding or with intent to defeat the bankruptcy law. 18 U.S.C. § 152.

## XIV.

■ Sindona contends that the Italian government is in effect seeking to try him for an offense of a political character within the meaning of Article VI of the Treaty,

and that therefore extradition should be denied. Article VI provides in pertinent part:

"Extradition shall not be granted in any of the following circumstances:

.        .        .        .        .

"5. When the offense for which extradition is requested is of a political character  .    .    .."

Sindona has submitted certain affidavits in support of his position, and claims the right to present additional proof at a further hearing.

Sindona's position breaks down into two theories. The first is that his alleged offense was "an outgrowth of political events" (Memorandum December 13, 1976 p. 31) in that his actions at the Milan banks were in response to certain governmental decisions engineered by left-wing political figures in the Italian government. The second theory is that, even though the charge of fraudulent bankruptcy may be non-political on its face, the motive of the Italian authorities in bringing the charge is to punish Sindona for his political beliefs. These arguments are invalid.

There is no authority whatever to support the idea that misappropriation of bank funds becomes a political offense because the perpetrator has encountered opposition from government regulators to his business plans. Traditionally, under Anglo-American law, a political crime has been held to be one which is "incidental to and formed a part of political disturbances" such as war or revolution. *In re Castioni,* [1891] 1 Q.B. 149, 166 (1890). *See, e. g., United States ex rel. Giletti v. Commissioner,* 35 F.2d 687 (2d Cir. 1929) (murder in political brawl between Fascists and Anti-Fascists in Italy held political); *In re Ezeta,* 62 F. 972 (N.D. Cal.1894) (charges of murder and robbery in context of warring governmental factions held political); *Jimenez v. Aristeguieta,* 311 F.2d 547, 560 (5th Cir. 1962), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963) ("There is no evidence that the financial crimes charged [against the former President of Venezuela] were committed in

the course of and incidentally to a revolutionary uprising or other violent political disturbance."). A thorough analysis of the Anglo-American cases dealing with political offenses, as well as authorities in other countries, is contained in García-Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law*, 48 Va.L.Rev. 1226 (1962).

I conclude that there is no persuasive authority under the law of any country which supports Sindona's position that misappropriation of bank funds becomes a political offense, where it is allegedly carried out in response to actions of government regulators.

The second theory advanced by Sindona regarding the political offense argument is that political motives lie behind the criminal charges against him. Sindona has submitted affidavits which express the opinion that he is being prosecuted because left-wing elements have gained control of organs of law enforcement in Italy.

The affidavits are totally unpersuasive. They are speculative. They are obviously submitted mostly by persons who are friends and partisans of Sindona. Most important, they display no conception of the gravity of the charges made against Sindona.

In any event, this theory of Sindona is invalid as a matter of law. The rule is that the question whether an alleged crime is or is not deemed to be a political offense is to be determined on the basis of the nature and circumstances *of the offense itself.* If, upon such a determination, the offense is found to be non-political, a court in an extradition proceeding will generally not inquire into the motive of the requesting country in bringing the criminal charges.

In *In re Lincoln*, 228 F. 70 (E.D.N.Y. 1915), *aff'd per curiam*, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916), the accused attempted to prove that Great Britain sought his extradition, on charges of forgery and obtaining money on false pretenses, for political motives. The district court rejected the argument, stating:

"[T]he accused did offer, as a reason why extradition should not be granted, that the so-called criminal charges had not been urged against him until after certain matters of a political nature, particularly incited by publications of his in the United States, had led the government of Great Britain to desire his punishment and to seek to interfere with his further public utterances. He therefore asked leave to prove that, even if extradited upon a criminal charge and tried therefor, the prosecution would be animated by the endeavor to make him endure punishment from political motives, and that no criminal proceedings were desired or had been set in motion, except as a cloak for reaching him upon charges that were not an extraditable offense. . . .

It does not seem that this question can be disposed of or should be disposed of by the court. The application for extradition is made to the government of the United States through the Department of State. The warrant of extradition must actually be executed by the Department of State, until the prisoner is delivered to the proper officer of the demanding government. The court is concerned solely with the question of the charge of crime, and that crime, as has been said, must be one known as a crime in the place where the hearing was held. If it be shown that the acts charged as crime indicate a political offense, and not a *criminal* one, as known to the jurisdiction holding the hearing, then certainly the court could not find that there was probable cause as to the commission of a crime. This would involve considering whether the offense as charged is political or criminal." 228 F. at 73–74.

*See also In re Ezeta*, 62 F. 972, 986 (N.D. Cal.1894); *Ramos v. Diaz*, 179 F.Supp. 459, 463 (S.D.Fla.1959); *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

For the above reasons, I hold that Sindona has made no showing that the criminal charges brought by the Italian government against him relate to an offense of a politi-

cal character within the meaning of Article VI of the Treaty.

Sindona seeks to rely upon the United Nations Convention Relating to the Status of Refugees, 19 U.S.T. 6259, T.I.A.S. No. 6577. This United Nations Convention became effective as to the United States on November 1, 1968, as a result of this country's accession to the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, which incorporates the Convention by reference.

Article 33, para. 1, of the Convention reads as follows:

"No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

Sindona appears to argue that the language in the Convention as to a refugee being threatened "on account of his . . . political opinion" creates a broader exception to the extradition power than does the language of the Italo-American treaty as to an offense of a political character. However, Sindona has failed to give effect to the further language of the Convention in article 1F:

"The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

.        .        .        .        .

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee . . . ."

The effect of this limiting language is that, at least for purposes of the present case, Sindona has no greater rights under the U.N. Convention than he does under the Extradition Treaty. Fraudulent bankruptcy is "a serious non-political crime" within the meaning of article 1F. A finding of probable cause that this crime was committed by Sindona constitutes "serious reasons for considering" that he committed the crime. Thus the U.N. Convention provides no basis for Sindona to avoid extradition.

There is no reason to hold any further hearing in connection with the political defense argument.

## XV.

Sindona argues that, even if he is otherwise extraditable, his extradition should be denied because he will not be afforded a fair trial in Italy. Sindona has submitted affidavits offering the opinion that Sindona is likely to be assassinated upon arrival in Italy and cannot obtain a fair trial. Sindona has further offered a large body of press excerpts from recent years, to support the theory that the Italian government is unable, and perhaps even unwilling, to exercise sufficient control over its criminal process to provide Sindona with a fair trial.

■ The general rule is that an argument of this kind is not properly addressed to the court in the extradition hearing, but must be made to the Department of State, which has the primary responsibility for determining whether the treaties with foreign countries are being properly respected and carried out. The Department of State has the discretion to deny extradition on humanitarian grounds, if it should appear that it would be unsafe to surrender Sindona to the Italian authorities. *In re Lincoln,* 228 F. 70, 74 (E.D.N.Y.1915), *aff'd per curiam,* 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916); *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *In re Normano,* 7 F.Supp. 329, 330–31 (D.Mass.1934).

In *Gallina v. Fraser,* 278 F.2d 77 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), the Second Circuit affirmed the denial of a habeas corpus petition challenging the granting of an extradition request. The court noted that "we have discovered no case authorizing a federal court, in a habeas corpus proceeding challenging extradition from the United States to a foreign nation, to inquire into the procedures which await the relator upon

extradition." *Id.* at 78. The court stated that, instead, the "authority that does exist points clearly to the proposition that the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government." *Id.* at 79. However, the court voiced the following caveat:

"We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require re-examination of the principle [of non-inquiry into foreign judicial procedures]." *·Id.*

■ I conclude that Sindona has not made even a threshold showing that he would be subjected to procedures in Italy which would be so violative of human rights as to prevent extradition. There is no indication in the material submitted by Sindona that the Republic of Italy subjects accused persons to anything approaching summary proceedings or "kangaroo courts," which occur in nations which disregard human rights. Italy has a criminal justice system which comports with standards of the civilized world.

It is well known that Italy is experiencing certain serious difficulties, including difficulties in the administration of its court system and its prisons. Trials are apparently delayed, and calendars are clogged. Terrorist activities have been directed on occasion at judges, lawyers, and prison personnel. However, the main point is that the Italian government is evidencing its intention and ability to keep the criminal justice system functioning in a proper manner even under the most difficult circumstances. The proceedings regarding the Red Brigade leaders over the last year are, of course, not completely analogous to the Sindona case. Nevertheless, they show the determination and ability of the Italian government to conduct a trial under the most difficult circumstances.

The Department of State has addressed a letter dated March 6, 1978 to the United States Attorney's office attesting that the United States has normal diplomatic relations with the Republic of Italy and all extant treaties are fully in force. .The letter further states that the United States has consented to have its military personnel in Italy, who are charged with offenses under Italian law, tried by Italian courts, and, if convicted, subjected to the penalties established by that law. The letter states that the experience to date indicates that United States military personnel have not been subjected to inhuman or degrading punishment in Italy. Finally, the letter states that in cases where the Department of State determines that the health or safety of a fugitive may be endangered by his surrender, it is the practice of the Department to bring to the attention of the requesting country the alleged danger, to request appropriate assurances from the requesting state, and to instruct the United States embassy in the requesting state, in the event that the fugitive is surrendered, to follow the case and report to the Department of State.

I conclude that Sindona's argument about possible harm or violation of rights in Italy does not furnish a basis for denial of the present extradition request. There is no reason for further hearing on this point.

*Conclusion*

For the foregoing reasons, the request of the Republic of Italy for the extradition of Michele Sindona is granted. This ruling will be certified to the Secretary of State, together with a copy of all evidence received in this proceeding, so that a warrant may issue upon the requisition of the proper authorities of the Republic of Italy for the surrender of Sindona according to the Extradition Treaty. This court will issue a warrant for the commitment of Sindona, so that he may be held until surrender to the Italian authorities is made.