UNITED STATES of America ex rel. Sol
R. RAUCH and Harold D. Rauch,
Relator-Appellants,

v.

Joseph STOCKINGER and Alex Krinsky,
Respondents-Appellees.

Nos. 318, 319, Docket 25567, 25568.

United States Court of Appeals
Second Circuit.

Argued April 9, 1959.

Decided July 10, 1959.

682

Max J. LeBoyer, Brooklyn, N. Y., for relator-appellants.

Dreiband, Bleecker & Silberman, New York City (Alexander Dreiband, New York City, of counsel), for respondents-appellees.

Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

On August 21, 1958 the Ambassador of Canada to the United States submitted a formal request to our Secretary of State for extradition of the relators herein, Sol R. Rauch and Harold D. Rauch, accusing them of having committed an extraditable offense within the jurisdiction of Canada. The Department of State acknowledged receipt of this request and informed the Canadian Ambassador that the request would be considered as soon as the necessary legal steps under 18 U.S.C. § 3184 [1] were completed. Accordingly, on September 26, 1958 counsel for the Attorney General of the Province of Ontario, Canada filed complaints under oath with the United States Commissioner for the Eastern District of New York. After a hearing in which evidence was submitted in the form of depositions and other documents, the Commissioner indicated on November 26, 1958 that he intended to certify to the Secretary of State that this evidence was sufficient to support the charge that the relators had committed an extraditable crime within Canada. The Commissioner then remanded the relators to the custody of the United States Marshal. Relators obtained a writ of habeas corpus from the District Court for the Eastern District of New York in order to have the court inquire into the legality of their custody by the United States Marshal. However, the writ was dismissed in an opinion dated February 16, 1959, 170 F.Supp. 506. This appeal is from that dismissal.

The requirement of a "treaty * * * for extradition" stated in 18 U.S.C. § 3184 is satisfied in this case by the Treaty between the United States and Great Britain of 1842, 8 Stat. 572 [2]

---

[1]. 18 U.S.C. § 3184 reads as follows:

"§ 3184. Fugitives from foreign country to United States

"Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any commissioner authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

[2]. Treaty between Her Majesty and the United States of America to Settle and Define the Boundaries between the Possessions of Her Britannic Majesty in North America, and the Territories of the United States; for the Final Suppres-

and the Supplementary Conventions of 1889, 26 Stat. 1508,[3] 1900, 32 Stat. 1864 [4] and 1951.[5] They clearly provide for and make extraditable the crime

sion of the African Slave Trade; and for the Giving up of Criminals, Fugitive from Justice in Certain Cases. Signed at Washington, August 9, 1842.
(Ratifications exchanged at London, October 13, 1842)

### "ARTICLE X.

"It is agreed that Her Britannic Majesty and the United States shall, upon mutual requisitions by them or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed: and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition and receives the fugitive.

### "ARTICLE XI.

"* * * The tenth article shall continue in force until one or the other of the parties shall signify its wish to terminate it, and no longer."

3. The pertinent portions of the Supplementary Convention of 1889 follow:
Supplementary Convention between Her Majesty and the United States of America for the Extradition of Criminals
"Whereas by the Tenth Article of the Treaty concluded between the United States of America and Her Britannic Majesty on the ninth day of August, 1842,

provision is made for the extradition of persons charged with certain crimes;
"And Whereas it is now desired by the High Contracting Parties that the provisions of the said article should embrace certain crimes not therein specified, and should extend to fugitives convicted of the crimes specified in the said Article and in this Convention;
* * * * *

### "Article I.

"The provisions of the said Tenth Article are hereby made applicable to the following additional crimes:
* * * * *

"3. Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained.

"4. Fraud by a bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries.
* * * * *

"Extradition is also to take place for participation in any of the crimes mentioned in this Convention or in the aforesaid Tenth Article, provided such participation be punishable by the laws of both countries.
* * * * *

### "Article VI.

"The extradition of fugitives under the provisions of this Convention and of the said Tenth Article shall be carried out in the United States and in Her Majesty's dominions, respectively, in conformity with the laws regulating extradition for the time being in force in the surrendering States."

4. The pertinent portions of the Supplementary Convention of 1900 follow:
Supplementary Convention between Her Majesty and the United States of America for the Mutual Extradition of Fugitive Criminals (Enlarging List of Crimes)

### "Article I.

"The following crimes are added to the list of crimes numbered 1 to 10 in the first Article of the said Convention of July 12, 1889, on account of which extradition may be granted, that is to say:
"11. Obtaining money, valuable securities, or other property by false pretenses.
* * * * *

### "Article II.

"The present Convention shall be considered as an integral part of the said

which relators were charged with having committed in Canada in the complaints of September 26, 1958. Each states:

"That heretofore, to wit, on March 21st, 1958, Justice of the Peace J. Little, for the County of York, Province of Ontario, Canada, at the Municipality of Metropolitan Toronto, issued a warrant for the arrest of the defendant above named for the theft of money and securities of the value of Nine Hundred Sixty Thousand ($960,000.00) Dollars obtained by deceit, falsehood or other fraudulent means, the property of Brilund Mines Limited, a crime under the Laws of Canada, pursuant to the Criminal Code of Canada, being Chapter 51, 2–3 Eliz. II, Statutes of Canada, 1953–54, with amendments thereto, embodying Sections 269(1), 274, 276, 280, 323.(1), 2.(15) of the Criminal Code of Canada.

"That on or about the 8th day of September, 1958, a true bill of indictment was handed up in the Supreme Court of Ontario, County of York, Province of Ontario, charging the defendant [Harold D. Rauch] with theft, fraud and conspiracy."

Relators apparently concede the applicability of the treaty. They argue, however, that the district court erred in dismissing the writ of habeas corpus because the evidence before the Commissioner was insufficient to satisfy the treaty requirements of production of evidence by the Government of Canada adequate to furnish reasonable ground for the belief that relators had committed within the Dominion of Canada acts constituting a criminal offense under the laws of Canada and under the laws of New York. Bingham v. Bradley, 1916, 241 U.S. 511, 36 S.Ct. 634, 60 L.Ed. 1136. We have no difficulty in holding that such evidence was produced and was before the Commissioner when he made his determination.

From an examination of the six depositions given by men who were in one way or another involved in the transaction in question, one could reasonably believe that relators, together with others, obtained control of Brilund Mines Limited without any payment therefor out of their personal funds, but obtained control by using the corporation's own money and property to obtain and convert to their personal use the controlling stock in that corporation. Those depositions reveal that one could reasonably believe that relators and their associates acting ostensibly as officers and directors of Brilund Mines Limited purchased with $960,000 worth of assets of that corporation from one D. Charles Stuart real property probably known by him to be of an estimated value of less than $1,000. It also seems quite likely from relators' relationship with Stuart and the course of their dealings with him that they also

---

Extradition Convention of July 12, 1889, and the first Article of the last mentioned Convention shall be read as if the list of crimes therein contained had originally comprised the additional crimes specified, and numbered 11 to 13 in the first Article of the present Convention."

5. The pertinent portions of the Supplementary Convention of 1951 follow:
Supplementary Convention to the Supplementary Convention between Her Majesty and the United States of America for the Mutual Extradition of Fugitive Criminals.

 \* \* \* \* \*

ARTICLE I

The enumeration numbered 11 in Article I of the Supplementary Extradition Convention signed on December 13, 1900, between the United States of America and Her Britannic Majesty, is hereby amended to read as follows:

11A "Obtaining property, money or valuable securities by false pretences or by defrauding the public or any person by deceit or falsehood or other fraudulent means, whether· such deceit or falsehood or any fraudulent means would or would not amount to a false pretence.

11B "Making use of the mails in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money under false pretences."

knew of this estimated value, or at least knew that $960,000 was a grossly excessive price. $900,000 of the $960,000 was then used by Stuart to procure control of Brilund Mines Limited by the purchase of a block of 600,000 of its shares of stock from one Ben Smith. Stuart paid Smith $1.50 per share although it would appear that the stock was then being traded at $.40 per share. 400,000 to 500,000 of the shares purchased were turned over to relators and their associates rather than to Stuart. Stuart also gave $5,990 in cash to relators and one other. All this was accomplished by votes of a new Board of Directors, of which relators were members, hurriedly put into office by the votes of this Smith stock. One could reasonably believe that this new directorate was put into control of the corporation by Smith in order to effect the corporate transaction with Stuart and the consequent sale of the Smith corporate stock to him. These depositions and relevant documentary exhibits were accompanied by a certificate of the Consul-General of the United States at the City of Toronto, Ontario, as required by 18 U.S.C. § 3190 [6] and were properly received into evidence by the Commissioner. Apparently no evidence was presented by relators to controvert them.

■ On March 12, 1958 the Auditor of the Ontario Securities Commission filed an Information and Complaint before a Justice of the Peace in the Province of Ontario charging that relators and others "did steal money and securities to the value of Nine Hundred and Sixty Thousand Dollars ($960,000) more or less, the property of Brilund Mines Limited," and with defrauding that company of the same amount "by deceit, falsehood or other fraudulent means." On March 21, 1958 that Justice issued warrants for their arrest. Later, on September 8, 1958 the Grand Jury for York County, Ontario returned an indictment against relators charging the same criminal acts that were set out in the Information and Complaint. After an examination of the applicable portions of the Criminal Code of Canada dealing with theft [7] and fraud [8] we are convinced

6. 18 U.S.C. § 3190 reads as follows:

"§ 3190. Evidence on hearing

"Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."

7. The Criminal Code of Canada, being Chapter 51, 2–3 Eliz. II, Statutes of Canada, 1953–1954, with amendments thereto, contains the law with regard to criminal offenses for the whole of the Dominion of Canada and every Province thereof, including the Province of Ontario. Said Criminal Code embodies the following provisions:

Section 269

(1) "Every one commits theft who fraudulently and without colour of right takes, or fraudulently and without colour of right converts to his own use or to the use of another person, anything whether animate or inanimate, with intent

(a) to deprive temporarily or absolutely, the owner of it or a person who has a special property or interest in it, of the thing, or of his property or interest in it,

(b) to pledge it or deposit it as security,

(c) to part with it under a condition with respect to its return that the person who parts with it may be unable to perform, or

(d) to deal with it in such a manner that it cannot be restored in the condition in which it was at the time it was taken or converted.

(2) A taking or conversion of anything may be fraudulent notwithstanding that it is effected without secrecy or attempt at concealment.

(3) For the purpose of this act the question whether anything that is converted is taken for the purpose of conversion, or whether it is, at the time it is converted, in the lawful possession of

that the facts set out in the depositions provided a reasonable ground for the Commissioner to believe that relators committed acts criminal under the laws of Canada. It likewise seems clear to us that the contents of the depositions pro-

vided a reasonable ground for him to believe that relators committed acts which would be criminal under the laws of New York. New York Penal Law, McKinney's Consol.Laws, c. 40, §§ 1290,[9]

the person who converts it is not material."

Section 274

"A person may be convicted of theft notwithstanding that anything that is alleged to have been stolen was stolen

(a) by the owner of it from a person who has a special property or interest in it,

(b) by a person who has a special property or interest in it from the owner of it,

(c) by the directors, officers or members of a company, body corporate, unincorporated body or of a society associated together for a lawful purpose from the company, body corporate, unincorporated body or society, as the case may be."

Section 276

(1) "Every one commits theft who, having received anything from any person on terms that require him to account for or pay it or the proceeds of it or a part of the proceeds to that person or another person, fraudulently fails to account for or pay it or the proceeds of it or the part of the proceeds accordingly.

(2) Where subsection (1) otherwise applies, but one of the terms is that the thing received or the proceeds or part of the proceeds of it shall be an item in a debtor and creditor account between the person who receives the thing and the person to whom he is to account for or to pay it, and that the latter shall rely only on the liability of the other as his debtor in respect thereof, a proper entry in that account of the thing received or the proceeds or part of the proceeds of it, as the case may be, is a sufficient accounting therefor, and no fraudulent conversion of the thing or the proceeds or part of the proceeds of it thereby accounted for shall be deemed to have taken place."

Section 280

"Except where otherwise prescribed by Law, every one who commits theft is guilty of an indictable offense and is liable

(a) to imprisonment for ten years, where the property stolen is a testamentary instrument or where the value of what is stolen exceeds fifty ($50.—) Dollars or

(b) to imprisonment for two years, where the value of what is stolen does not exceed fifty ($50.—)."

Section 2

"(15) 'every one,' 'person,' 'owner,' and similar expressions include Her Majesty and public bodies, bodies corporate, societies, companies, and inhabitants of counties, parishes, municipalities and other districts in relation to the acts and things that they are capable of doing and owning respectively.

32. "property includes

(a) real and personal property of every description and deeds and instruments relating to or evidencing the title or right to property, or giving a right to recover or receive money or goods.

(b) property originally in the possession or under the control of any person, and any property into or for which it has been converted or exchanged and anything acquired at any time by such conversion or exchange.

37. "steal" means to commit theft.

42. "valuable security" includes

(a) an order, exchequer acquittance or other security that entitles or evidences the title of any person

(i) to a share or interest in a public stock or fund or in any fund of a body corporate, company or society, or

(ii) to a deposit in a savings bank or other bank."

8. Section 323 reads as follows:

Section 323

"(1) Every one who, by deceit, falsehood or other fraudulent means, whether or not it is a false pretense within the meaning of this Act, defrauds the public or any persons, whether ascertained or not, of any property, money or valuable security, is guilty of an indictable offense and is liable to imprisonment for ten years."

9. Section 1290 of the New York Penal Law reads as follows:

"§ 1290. Larceny defined

"A person who, with the intent to deprive or defraud another of the use and benefit of property or to appropriate the same to the use of the taker, or of any other person other than the true owner, wrongfully takes, obtains or withholds, by any means whatever, from the possession of the true owner or of any other

1294 [10] and 1295.[11] It is immaterial that the acts in question constitute the crime of theft and fraud in Canada and the crime of larceny in New York State. It is enough if the particular acts charged are criminal in both jurisdictions. Collins v. Loisel, 1922, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956.

 We also find without merit what appears to be relators' claim that they were not properly charged in Canada with having committed a crime. They base this contention on the absence from the Information and Complaint and the indictment of any enumeration of "overt acts," and the lack of the words "with intent" therein. The Complaint and the indictment set out the charges in practically identical language. The indictment states:

"1. The jurors for Her Majesty the Queen present that Ben Smith, D. Charles Stuart, Stanley I. Schonbrun, Sol R. Rauch and Harold D. Rauch during the year 1957, at the City of Toronto in the County of York and elsewhere, did steal money and securities to the value of $960,000.00 more or less, the prop-

erty of Brilund Mines Limited, contrary to the Criminal Code.

"2. The said jurors further present that the said Ben Smith, D. Charles Stuart, Stanley I. Schonbrun, Sol R. Rauch and Harold D. Rauch, during the year 1957 at the City of Toronto in the County of York and elsewhere, by deceit, falsehood or other fraudulent means defrauded Brilund Mines Limited of money and securities to the value of $960,000.00 more or less, contrary to the Criminal Code."

It is not our duty on this appeal to order the relators' release merely because we do not find on this appeal "all the factitious niceties of a criminal trial at common law." Glucksman v. Henkel, 1911, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830. "Form is not to be insisted upon beyond the requirements of safety and justice." Fernandez v. Phillips, 1925, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970. The criminal intent required by both the Canadian [12] and New York statutes [13] is necessarily involved in the charges as alleged and need not be set out *in haec verba*. Nor does

---

person any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind, steals such property and is guilty of larceny.

"Hereafter it shall be immaterial in, and no defense to, a prosecution for larceny that: 1. The accused obtained possession of, or title to, such property with the consent of the person from whom he obtained it, provided he induced such consent by a false or fraudulent representation, pretense, token, or writing; or

"2. The accused in the first instance obtained possession of, or title to, such property lawfully, provided he subsequently wrongfully withheld or appropriated such property to his own use or the use of any person not entitled to the use and benefit of such property; or

"3. The person from whom the accused obtained such property intended to part with title to, as well as possession of, such property, or with possession as well as title; or

"4. The purpose for which the owner was induced to part with possession

of such property was immoral or unworthy."

10. The pertinent portion of Section 1294 of the New York Penal Law reads as follows:

"§ 1294. Grand larceny in first degree

"A person is guilty of grand larceny in the first degree, who steals, or unlawfully obtains or appropriates, in any manner specified in this article:

"1. * * *

"2. * * *

"3. Property of the value of more than five hundred dollars, in any manner whatever."

11. Section 1295 of the New York Penal Law reads as follows:

"§ 1295. Grand larceny in first degree; how punished

"Grand larceny in the first degree is punishable by imprisonment for a term not exceeding ten years."

12. See footnote 7, supra.

13. See footnote 9, supra.

the Information and Complaint of March 12, 1958, or the subsequent indictment, need to contain a list of overt acts making up the crime with which relators are charged. They need be only as precise as is necessary to allow a defendant to prepare a defense, or to prevail upon a plea of former jeopardy in case of reindictment. Surely relators are sufficiently apprised here of the nature of the charges against them.

Affirmed.