In the Matter of EXTRADITION OF TANG YEE–CHUN, a/k/a "Tang Lam-lap", and Chan Wai–King, a/k/a "Rita Chan".

No. 87 Crim.Misc. 1, p. 10 (ELP).

United States District Court, S.D. New York.

Nov. 30, 1987.

Lawrence H. Schoenbach, New York City, M. Cherif Bassiouni, Chicago, Ill., for Tang Yee–Chun.

Susan G. Kellman, Carl M. Bornstein, New York City, for Chan Wai–King.

Catherine Gallo, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, for the government.

## ORDER AND OPINION

PALMIERI, District Judge.

The relators, Tang Yee–Chun ("Tang") and Chan Wai–King ("Chan") were arrested on March 6, 1987 pursuant to warrants issued by a magistrate of this Court in accordance with an extradition treaty between the United States and the United Kingdom to answer a complaint seeking their extradition to Hong Kong. The complaint, dated March 5, 1987, charges Tang, Chan, and a third person not a party to this proceeding, with fraudulent trading practices resulting in the collapse and multi-million dollar losses to the depositors of a banking-type entity called the America and Panama Finance Company Limited ("A & P"). Tang and Chan have remained in custody since their arrest.

On April 16, 1987, the United Kingdom formally requested their extradition to Hong Kong on 46 separate charges involving false accounting and false statements by a corporate director or officer. Both before and after that date, the relators moved unsuccessfully before other judges of this Court for their release from custody and other relief. This proceeding has been delayed by repeated changes of counsel—Tang has retained five successive lawyers, and Chan four. Each has also had a Hong Kong lawyer collaborating with American counsel and in attendance at the evidentiary hearing. This Court was finally able to hold an evidentiary hearing on October 20, 1987, nearly eight months after the arrests. Both relators have filed petitions for writs of habeas corpus.

### I

*Preliminary Findings and Contentions*

The Court must first make the findings required by the statute governing extradition, 18 U.S.C. § 3184.[1] First, a valid extradition treaty exists—namely the Treaty between the United States and the United Kingdom, signed June 8, 1972, and entered into force January 21, 1977. TIAS 8468, 28 U.S.T. 227 (the "Treaty"). The Court further finds the crimes with which Tang and Chan are charged are provided for by the Treaty. 28 U.S.T. at 235, Nos. 19–20. Tang and Chan concede that they are the persons sought, and that they were found within this Court's jurisdiction. They do, however, dispute the existence of sufficient evidence "to sustain the charge". *See* Part III, *infra*.

Tang contends that the request for extradition on some of the charges was not accompanied by a warrant for his arrest, as

---

1. 18 U.S.C. § 3184 provides:

"Fugitives from foreign country to United States:

"Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

is required by Article VII(3), 28 U.S.T. at 231. The Court need only point out the absence of the necessary warrants to the Secretary of State, but may not refuse to certify the extradition of Tang on those charges. *See Hill v. United States*, 737 F.2d 950, 952 (11th Cir.1984) ("the warrant may specify all the charges if the requesting country so chooses, but it need refer to only one"); *cf. Shapiro v. Ferrandina*, 478 F.2d 894, 905–06 & n. 10, (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed. 2d 98 (1976). The relators contend that the acts they have allegedly engaged in are not criminal under the laws of both Hong Kong and the United States, as Article III requires, 28 U.S.T. at 229–30. *See* Part IV, *infra*. Chan contends that the United Kingdom cannot abide by certain other requirements of the Treaty. *See* Part V, *infra*.

In addition to making a number of due process claims, the relators raise procedural technicalities, with the primary authority for their arguments being the asserted experience of Tang's counsel. However, we have not found citation to his own writings, without support from binding authority, to be sufficiently persuasive.

## II

### *The Evidence*

On October 20, 1981, the relators appeared before the Court with their counsel and were given an opportunity to explain the evidence submitted on behalf of the government of Hong Kong. They had possession of copies of the government's submission, and access to the actual submission, for more than six months before the hearing.

At the hearing, the government offered no witnesses; nor did the relators. Indeed, at the hearing the relators seemed unprepared to offer any evidence at all, and their presentation consisted mainly of narrow technical attacks on the government's submission. A recurrent theme in the relators' submissions to this Court is the suggestion that they are innocent of any wrongdoing and that this Court should provide them with the facilities for establishing their innocence. The issue of guilt or innocence is not before this Court. It can be appropriately passed on only by the courts in Hong Kong.

In view of the limitations necessarily imposed by the nature of an extradition hearing,[2] the six months the relators had to prepare, the fact of their appearance before the Court, and the explicit invitation extended by the Court to offer explanatory affidavits, it is concluded that they had ample notice and opportunity to be heard and suffered no deprivation of any rights to which they were entitled.

■ The government offered, and the Court accepted as duly authenticated, 18 volumes of affidavits and other documents which had been certified and sealed by the United States Consulate General in Hong Kong. The relators challenge the evidence submitted and contend that "this court must ... exclude any evidence that would be inadmissible in an extradition proceeding conducted in Hong Kong". They put forward the remarkable proposition that this Court must apply the Hong Kong laws of evidence. Their argument ignores the statutory provision that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the [evidence] so offered [is] authenticated in the manner required". 18 U.S.C. § 3190. The proper authentication of the documents submitted by the government of Hong Kong conclusively supports their admissi-

---

**2.** *See Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir.) (due process in extradition proceeding—arguably required by language of U.S.–Australia treaty—did not include speedy trial requirement), *cert. denied*, 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980) (no right to cross-examine witnesses or to rebut prosecutorial evidence, citing *Bingham v. Bradley*, 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916)); *Jhirad v. Ferrandina*, 536 F.2d 478, 485 n. 9 (2d Cir.) (no sixth amendment guarantee of speedy trial), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 *reh'g denied*, 429 U.S. 988, 97 S.Ct. 511, 50 L.Ed.2d 600 (1976); *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 927–28 (2d Cir.1974) (no fifth amendment guarantee against double jeopardy).

bility. *See United States v. Galanis*, 429 F.Supp. 1215, 1227–29 (D.Conn.), *aff'd in relevant part, rev'd on other g'nds sub nom Galanis v. Pallank*, 568 F.2d 234, 240 (2d Cir.1977).[3] Any claim of inadmissiblity in a Hong Kong extradition proceeding is irrelevant.

▮ The relators further contend that the testimony of accomplices Agnes Kwok and Eva Hui is inherently unreliable and should not be considered, and that the extradition should therefore be denied. Accomplice testimony is competent to support a finding of probable cause. *Eain v. Wilkes*, 641 F.2d 504, 510 (7th Cir.) ("such evidence may be of particular importance in extradition cases where all the alleged criminal activity occured in a distant country"), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Curreri v. Vice*, 77 F.2d 130, 132 (9th Cir.) (accomplice testimony "is, next to the confession of the defendant, the most satisfactory kind of evidence that can be produced" in an extradition hearing), *cert. denied*, 296 U.S. 638, 56 S.Ct. 170, 80 L.Ed. 454 (1935); *accord Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir.1984). The accomplice statements are also attacked as made without personal knowledge, as is required by *Rice v. Ames*, 180 U.S. 371, 375–76, 21 S.Ct. 406, 407–08, 45 L.Ed. 577 (1901). These affidavits are replete with detail and demonstrate that the accomplices were indeed testifying from personal knowledge. Additionally, their accuracy is corroborated by the impressive affidavit of Mr. David Mace, a partner of the Arthur Anderson accounting firm, hired by the Hong Kong government to investigate the financial details of A & P's collapse. He made a meticulous examination and careful analysis of A & P's finances. The attack on Mr. Mace's affidavit as "peppered with inadmissible legal conclusions" ignores the fact that the standards governing the admissibility of evidence at trial are inapplicable. Neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure are applicable in these proceedings. *Messi-*

*na v. United States*, 728 F.2d 77, 80 (2d Cir.1984); *Simmons v. Braun, supra*, 627 F.2d 635 at 636; (2d Cir.1980); Fed.R.Evid. 1101(d)(3); Fed.R.Crim.P. 54(b)(5). The relators' attack on Mr. Mace's opinion as to the source of funds used to purchase A & P's main asset is of no probative value in this proceeding but may be raised at trial. *See Matter of Sindona*, 450 F.Supp. 672, 686–92 (S.D.N.Y.), *writ of habeas corpus denied sub nom Sindona v. Grant*, 461 F.Supp. 199 (S.D.N.Y.1978), *aff'd*, 619 F.2d 167 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

▮ The relators attack the "certifications" (affidavits) of several of the Hong Kong Magistrates on technical grounds. One Magistrate certifies that certain copies are "true and correct" but does not state that he compared the copies with originals. The certification complies with the requirements set out in the Treaty and cited by the relators. The objection is deemed frivolous. Other Magistrates' certifications contain certain typographical errors: a switched name, mis-typed digits in dates, exhibits put in the wrong order. Objections to these errors are also deemed to be frivolous.

We place particular reliance on the affidavits of Mr. Mace, of Tang's alleged accomplices, of A & P's depositors, and of the Hong Kong investigatory authorities. Additionally, there are numerous financial documents referred to in those affidavits and submitted as exhibits to the affidavit of Philip Layton, a detective with the Royal Hong Kong Police Force, which substantiate the charges against the relators.

### III

#### *Probable Cause*

The Treaty prohibits the relators' extradition unless the evidence would be sufficient to justify their committal for trial according to United States law. Article IX(1); *see also* 18 U.S.C. § 3184. The Treaty thus requires a finding of probable cause. *Sindona v. Grant, supra*, 619 F.2d

---

**3.** *Accord In re Breen*, 73 F. 458, 458 (C.C.S.D.N. Y.1896); *In re McPhun*, 30 F. 57, 60 (C.C.S.D.N. Y.1887); *In re Behrendt*, 22 F. 699, 700 (C.C.S.D. N.Y.1884).

at 175 (quoting *Benson v. McMahon,* 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888); and citing *Collins v. Loisel,* 259 U.S. 309, 315–17, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922); *Ornelas v. Ruiz,* 161 U.S. 502, 512, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896); *Shapiro v. Ferrandina, supra,* 478 F.2d at 901; and *Jhirad v. Ferrandina, supra,* 536 F.2d at 485). Under that standard, the Court must satisfy itself that there are reasonable grounds to believe Tang and Chan are guilty. *Melia v. United States,* 667 F.2d 300, 302 (2d Cir.1981). The fraudulent activity on the part of Tang and Chan is well documented and supports all 46 of the specific charges on which Hong Kong has requested they be extradited.

## A. Background.

■ The underlying case involves the relationship of Tang and Chan to a Hong Kong company called the America and Panama Finance Company Limited ("A & P"). A & P was, under Hong Kong Law, a "Deposit Taking Company"—a company formed for the purpose of borrowing money from depositors. Between September 22, 1980, when it opened, and January 7, 1983, when it closed its doors unable to pay the more than HK$ 17 million it owed its depositors, the company lost more than HK$ 25 million.[4] During that time, it made scores of loans to persons who either did not exist or had no knowledge of the loans. The documentation evidencing the payment of A & P's capital requirements, the identities of those who ran and owned it, and the asserted personal loans it made was false or non-existent.

## B. Tang's Relationship to A & P.

Tang was neither a director nor shareholder, neither lender nor borrower. Nonetheless, he exercised close control over A & P. He personally set A & P's interest rates, prepared its newspaper advertisements and negotiated the purchase of its only major asset, a parcel of real estate where the offices of several of Tang's companies were located. He employed numerous female lieutenants who had limited education, and whenever he was absent from Hong Kong, he communicated daily with them by telephone, received daily telex reports from them containing detailed information about the affairs of A & P as well as other companies he controlled, and gave them instructions. Upon the commencement of a government investigation of Tang's companies in October, 1981, Tang left Hong Kong never to return. As A & P began to collapse and the government investigation was expanded, one of Tang's lieutenants flew to New York to brief him.

Several of his key employees confirm that Tang was in complete control of the affairs of A & P. For example, Eva Hui states that "Tang.... carried out all the duties [and] made all the decisions of a managing director." According to Agnes Kwok, the nominal president of A & P, "Tang also arranged for and directed the formation and registration as a Deposit Taking Company of A & P.... He wanted to keep control but not named in case something went wrong."

Tang left an unmistakable paper trail of fabricated financing behind him in Hong Kong. The finances of his lieutenants and companies were meticulously sorted out by Mr. Mace, a professional accountant who concluded that it was Tang who supplied the capital upon which A & P relied, that it was Tang who exercised control over the bank accounts into which proceeds of the falsified loans were deposited, and that it was Tang who directed the making of those loans and the way they were accounted for on A & P's books.

Finally, Tang has declined the invitation of the Crown Colony of Hong Kong to answer charges there. He has remained absent since he first learned of the existence of an investigation, successfully maintaining a fugitive status in Singapore and Brazil prior to his arrest in New York. His use of several aliases during this period and his unwillingness to return to Hong Kong are not consonant with his assertions

4. The reference is to Hong Kong dollars. During the relevant time period, one United States dollar was exchangeable for approximately five Hong Kong dollars.

of innocence. The maintenance of a fugitive status for over six years can be construed as a consciousness of guilt. In *Elias v. Ramirez*, 215 U.S. 398, 407–08, 30 S.Ct. 131, 135–36, 54 L.Ed. 253 (1910), the Court used the fact of flight as evidence to be considered. There, as here, the opportunity to explain flight was offered, and declined by the person sought to be extradited.[5]

The affidavit of relator Chan, sworn to October 13, 1987, seeking to exculpate Tang, cannot be weighed in the balance. *Abu Eain v. Adams*, 529 F.Supp. 685, 691 (N.D.Ill.1980), *aff'd sub nom Eain v. Wilkes, supra.* Nor can Tang's offer of proof that he is actually owed HK$ 7 million by A & P. *Matter of Sindona, supra*, 450 F.Supp. at 686–92. The fact of his control over A & P is sufficiently established for purposes of extradition, and its legal consequences must be left to the trial court.

### C. Chan's Relationship to A & P.

Chan was A & P's chief accountant, one of its directors and one of its shareholders. She orchestrated the details of A & P's day to day affairs, beginning with its incorporation. She signed pay checks, set daily interest rates in Tang's absence and personally supervised the issuance of all personal loan checks and interest payments on A & P's mortgage. Her signature appears not only on virtually all of A & P's bank accounts, but also on the endorsements of countless checks both to and from A & P.

### D. An Overview of the Fraudulent Loans.

A & P operated through a scheme of fabricated capitalizations followed by false loans. Money circulated from Tang to A & P and back again to Tang very quickly. A & P eventually drew the attention of Hong Kong investigators, and as they began to close in on A & P, the scheme expanded to include a set of bogus repayments followed by another set of false loans.

A & P's capital purportedly came from a handful of shareholders located outside of Hong Kong. In reality, the capital came from Tang's bank accounts. A & P would then quickly issue loans based on personal lines of credit extended to persons who either did not exist or had no knowledge of the loans. These lines of credit were extended with no documentation. The true beneficiary was Tang, via bank accounts or companies that he controlled.

Twice during 1980, A & P received capital one day and loaned it out the next. During 1981 and 1982, loans were also funded by deposits received from the unsuspecting public. In June 1982, the Hong Kong authorities questioned A & P's ability to remain financially sound, and, shortly thereafter, many of the false loans were purportedly repaid in their entirety. In order to cover up the scheme, Tang and his accomplices invented a new set of false borrowers, and purportedly loaned it millions of dollars. Again, the money passed to the control of Tang and Chan. As of January 7, 1983, when A & P closed, nearly HK$ 5.5 worth of loans to these three individuals was outstanding. According to Mr. Mace, the booking of these loans "suggests paper transactions intended to disguise the movement of funds."

### E. The May 1980 Loans and Lines of Credit.

In May 1980, A & P extended five personal lines of credit worth HK$ 2 million to Chiu Sik-yin (Chiu), Carmen Wong (Wong), Leung Ngan-yuk (Leung), Lo Lai-hing (Lo) and William Cheung (Cheung). A & P established these lines of credit without supporting documentation or analysis—promissory notes, letters of confirmation, and powers of attorney for the five borrowers

---

5. *Accord Eain v. Wilkes, supra*, 641 F.2d at 511; *Currie v. Vice, supra*, 77 F.2d at 133; *see also Green v. United States*, 259 F.2d 180, 182 (D.C. Cir.1958), *cert. denied*, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959); *United States v. Heitner*, 149 F.2d 105, 107 (2d Cir.), *cert. denied*, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432, *reh'g denied*, 326 U.S. 809, 66 S.Ct. 164, 90 L.Ed. 494 (1945); *United States v. Dalhover*, 96 F.2d 355, 359 (7th Cir.), *cert. denied*, 305 U.S. 632, 59 S.Ct. 100, 83 L.Ed. 406, *reh'g denied*, 305 U.S. 672, 59 S.Ct. 154, 83 L.Ed. 436 (1938); *Kanner v. United States*, 34 F.2d 863, 866 (7th Cir.1929).

would be forged two years later. The individuals themselves had no knowledge that they were being extended credit. As Agnes Kwok explained, "Tang was accustomed to using the names of his relatives, previous employees' friends or relatives, and friends of his lieutenants as borrowers. The persons whose names were used did not know ... that they were borrowers." The May 1980 borrowers correspond to this pattern: Wong and Cheung are former employees and Leung is the sister-in-law of an employee; Lo is relator Chan's illiterate mother; Chiu is apparently Tang's first wife's brother-in-law.

The day after A & P received its initial capital, a falsified loan was made to each of the five fictitious borrowers. The five loans took the form of bearer checks which bore consecutive numbers and were deposited in Tang's account at United Overseas Bank.

There is substantial evidence that these loans were fraudulent and that Tang and Chan were responsible. The loans were recorded on A & P's books as bona fide transactions.

### F. Further Loans in Continuance of the May 1980 Lines of Credit.

The scheme continued through 1980 and 1981. The circulation of funds at issue occured on the three days following the close of A & P's fiscal year on March 31, 1981. Again, purported loans followed closely on the heels of a purported capital infusion. This time, a total of twelve loans was made to the five fictitious borrowers in amounts totalling HK$ 1.98 million. Again, the loans resulted in benefit to Tang and Chan. Some checks were actually payable to Tang. Others, endorsed by Chan and another employee, were deposited in an account controlled by Tang and immediately used to pay an airline company with which Tang did substantial business. Finally, some checks were payable to cash and endorsed by Chan. It is not known where the money was finally deposited. As Mr. Mace commented, "These loans were all unsecured, and made in circumstances where recovery [ ] depend[ed] upon

Tang's willingness and ability to repay." Tang and Chan directed the accounting of the false loans, which were recorded on the books of A & P as bona fide transactions. They appear to have been intended to benefit Tang and Chan, both individually and jointly, as co-conspirators.

A & P made more false loans, apparently drawn on the funds of its depositors, throughout the first half of 1982: five in January, seven during May and June. All the loans were made to appear on A & P's books as bona fide transactions, but either Chan was the direct beneficiary or the proceeds were taken in cash and could not be traced. Due to the patently false nature of these loans, and the continuing spurious nature of A & P's business, a reasonable inference can be drawn that the money went to the benefit of Tang and Chan.

### G. The Hong Kong Investigation of A & P.

In April 1982, Hong Kong authorities began to investigate A & P, focusing on the loans to the five fictitious borrowers. Unable to answer the investigators' queries satisfactorily, Chan and other lieutenants turned to Tang, who instructed them to forge documentation to support the false loans. Over the course of a few evenings, Chan and others prepared false loan files which included forged security agreements, promissory notes and powers of attorney. They also falsified "confirmation letters" purportedly sent by the five borrowers upon the request of Hong Kong authorities.

In further response to this investigation, a cover-up evolved. Funds circulated from A & P to other Tang-controlled entities or newly created fictitious borrowers, and then back to A & P in the form of purported repayments of the loans that had been made to the earlier fictitious borrowers. Tang and his accomplices apparently believed that by appearing to call in the five original loans, they could persuade the authorities that A & P was a financially viable concern, and not in need of supervision. At the same time, the new fictitious bor-

rowers would serve Tang as a tool for continuing to draw cash out of A & P.

### H. The Loans to the Luxembourg Finance Company and Purported Repayment of the Loans to the Five Fictitious Borrowers.

In furtherance of the cover-up, on June 11 and 12, 1982, A & P loaned a total of HK$ 2 million to a company called the Luxembourg Finance Company Ltd. ("Luxembourg"). Luxembourg was another banking-type company controlled by Tang: he was a director, the largest shareholder and the only person authorized to sign singly on Luxembourg's bank accounts.

The proceeds of the loans to Luxembourg were deposited in a bank account controlled by Tang. Over the next four days, the entire HK$ 2 million was withdrawn, mainly in the form of bearer checks. Nearly all of these checks were in turn deposited into an A & P bank account, used to "pay off" the loans which had been made to two of the fictitious borrowers: Chiu and Leung. Both the loans and the repayments were recorded on A & P's books as bona fide transactions. In addition, false loans to newly created fictitious borrowers were used to repay the Luxembourg loans (see sub-part (I), infra.). These two repayments were recorded on A & P's books as bona fide transactions, as were three other purported repayments, recorded on A & P's books June 17, 19 and 21, 1982, but these were by no means the only loans or repayments for which evidence exists.

The several volumes of affidavits and documents, in conjunction with the assessment of Hong Kong's accounting expert, disclose a fraudulent scheme on a large scale.

### I. The Loans to the Second Set of Fictitious Borrowers.

A second set of fictitious borrowers was created by Tang in June 1982. These borrowers did not exist at all, and the supporting documentation for their lines of credit was much more carefully forged. The three borrowers were named Tina Lam,

Lily Wong and May Chiu Chiang. The names of all of them were used for the purpose of funneling funds of A & P to Tang and Chan during the second half of 1982. It is quite clear that these transactions were all part of the fraudulent activities of the relators.

### J. The Fraudulent Report.

The final extradition request relates to A & P's annual financial statement, published in September 1982. The government alleges that assets were overstated by at least HK$ 10.5 million, which were purportedly "personal loans". Neither the personal loans nor the security for those loans (described in the financial statement as "overseas properties") were genuine. This misstatement was in furtherance of the entire scheme set forth above.

### IV

### Double Criminality

The relators contend that the requirements of Article III(1)(a) and (c) of the Treaty, 28 U.S.T. at 229–30, have not been met because the acts charged are not crimes under the laws of the United States nor under those of Hong Kong.

### A. Criminality Under United States Law.

 The offenses charged and the acts on which the charges are based must be criminal under the laws of the United States. *Shapiro v. Ferrandina, supra,* 478 F.2d at 909. That requirement has been met. The acts that Tang and Chan are charged with committing, if proven, would constitute crimes under United States law. It is a crime to make false entries in the books of a national bank or savings institution, 18 U.S.C. §§ 1005, 1006; *see Matter of Sindona, supra,* 450 F.Supp. at 692; to make false statements in any matter within the jurisdiction of any United States department or agency, 18 U.S.C. § 1001; *see United States v. Simon,* 425 F.2d 796, 798 (2d Cir.1969) (false corporate financial statements), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.

2d 420 (1970); and to use mail or wire communication to execute a scheme to defraud, 18 U.S.C. §§ 1341, 1343. These crimes are substantially analogous to the Hong Kong crimes of false accounting and false statements by a corporate director.

 ▮ The relators argument that the offenses charged are not extraditable because the jurisdictional element of all federal crimes bars them from being analagous to the Hong Kong crimes is not meritorious. The crimes need only be substantially similar. *Collins v. Loisel, supra,* 259 U.S. at 312, 42 S.Ct. at 470; *Messina v. United States, supra,* 728 F.2d at 80; *Brauch v. Raiche,* 618 F.2d 843, 850–51 (1st Cir.1980). The jurisdictional element of federal crimes derives from the nature and requirements of our federal system. The assertion that §§ 1005 and 1006 were designed merely to protect the F.D.I.C. and the F.S.L.I.C. ignores the fact that those insurance systems were themselves tools designed to promote the integrity of the banking system. The criminal statutes are complementary tools. *See Weir v. United States,* 92 F.2d 634, 636–37 (7th Cir.), *cert. denied,* 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937) *reh'g denied,* 302 U.S. 781, 58 S.Ct. 479, 82 L.Ed. 603 (1938). 18 U.S.C. §§ 1001, 1005 and 1006 are substantially analagous to the crimes of false accounting and false entries as set forth under the laws of Hong Kong.

Were it necessary, the Court could look to New York law to find criminal penalties for the acts charged. *Hu Yau–Leung v. Soscia,* 649 F.2d 914, 918 (2d Cir.), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981). The acts of relators are class E felonies under N.Y.Penal Law § 175.10. *See People v. Felber,* 264 A.D. 181, 184, 34 N.Y.S.2d 609 (1st Dep't 1942) (intent to conceal embezzlement scheme sufficient to support finding of felonious intent); *People v. Curtiss,* 118 A.D. 259, 261 (1st Dep't 1907) (intent to conceal larceny sufficient). By the relators' own admission, § 175.10 is analagous to the crimes charged.

## B. *Criminality Under Hong Kong Law.*

The acts allegedly committed by Tang and Chan, if proven, would be crimes under the pertinant laws of Hong Kong, which are set forth in the affidavit of Ian Lloyd, sworn to on March 31, 1987, in ¶¶ 20–21. The relators do not dispute that the false directors' statement is a crime under the laws of Hong Kong. At issue is § 19(1)(a) of the Hong Kong theft ordinance, which, at the time the warrants were issued, provided,

> § 19(1) "Where a person dishonestly, with a view to gain for himself or another or with intent to cause loss to another—
>
> (a) "destroys, defaces, conceals or falsifies any account or any record or document made or required for any accounting purpose;
>
> \* \* \* \* \* \*
>
> "he shall be guilty of an offence and shall be liable on conviction upon indictment to imprisonment for 7 years."

Tang and Chan are charged with "dishonest" acts performed "with a view to gain ... or with intent to cause loss to another". They are charged with "falsif[ying]" the records of A & P.

The relators make several offers of proof, via affidavits of Hong Kong lawyers and accountants, that the "vouchers" referred to in the Hong Kong arrest warrants are not "made for any accounting purpose". The accounting entries apparently were made in ledgers and on vouchers, but the Hong Kong arrest warrants refer specifically to vouchers. These offers must be rejected. A similar offer of proof in a similar case about the collapse of a banking entity was rejected as "contradictory" rather than "explanatory". *See Matter of Sindona, supra,* 450 F.Supp. at 689. While the Hong Kong courts may ultimately decide that these vouchers were not made for an accounting purpose, the Hong Kong government has, at this juncture, offered sufficient evidence to demonstrate that they were in fact made for such a purpose. That evidence includes both the extensive reliance of Mr. Mace on the vouchers and the decisions of two Hong

Kong Magistrates to issue warrants based on the alleged falsification of vouchers. The relators' argument would be more appropriately raised before the Hong Kong tribunals. *See Melia v. United States, supra*, 667 F.2d at 303 ("we are ... not expected to become experts in the laws of foreign nations").

Article III of the Treaty has been satisfied.

## V

### *The United Kingdom's Ability to Abide by the Treaty*

 Chan argues that the United Kingdom will be unable to abide by its Treaty obligations in the event of her extradition to Hong Kong. She has offered to prove that upon the resumption of the exercise of sovreignty over Hong Kong by the People's Republic of China (the "People's Republic") in 1997: (1) she will effectively be extradited not to Hong Kong but to the People's Republic, in violation of Article XII of the Treaty, 28 U.S.T. at 233; (2) she might be subject to prosecution for offenses for which she was not extradited, again in violation of Article XII of the Treaty, *id;* and (3) she might be subject to the death penalty—if the People's Republic retroactively changes its own law to include the death penalty for her crimes—in violation of Article IV of the Treaty, *id* at 230.

Her argument seems to be that these possibilities, remote as they are, should so shock this Court's sense of decency that it should not grant extradition. Indeed there is dictum that a person who will be subjected to procedures or punishment "antipathetic to a federal court's sense of decency" should not be extradited. *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960); *accord United States ex rel. Bloomfield v. Gengler, supra*, 507 F.2d 925 at 928 (2nd Cir.1974). But the courts have consistently rejected the arguments of persons attempting to avoid extradition on such grounds, even when their situations were more compelling than Chan's. *See, e.g., Demjanjuk v. Petrovsky*, 776

F.2d 571, 583 (6th Cir.1985) (accused war criminal extradited to Israel to face probable death sentence), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312, *writ of habeas corpus and stay denied sub nom Demjanjuk v. Meese*, 784 F.2d 1114 (D.C.Cir.1986); *Sindona v. Grant, supra*, 619 F.2d at 174 (accused swindler feared he would be murdered by his political enemies); *Gallina v. Fraser, supra*, 278 F.2d at 79 (fugitive extradited despite the fact that he would have no opportunity to defend himself upon his return to Italy). Chan's concerns are too speculative and too remote to justify any action by this Court.

 We are not persuaded by an alleged expert's affidavit that a possibility of eventual capital punishment awaits the relators if they are extradited. It is the function of the Secretary of State, in any event, to determine whether extradition can be avoided on humanitarian grounds. *See Sindona v. Grant, supra*, 619 F.2d at 174. The United States courts "are bound by the existence of an extradition treaty to assume that the trial will be fair". *Rosado v. Civletti*, 621 F.2d 1179, 1195 (2d Cir.) (quoting *Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1910)), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70, *reh'g denied*, 449 U.S. 1027, 101 S.Ct. 597, 66 L.Ed.2d 489 (1980); *see also Sindona v. Grant, supra*, 619 F.2d at 174–75. While there is no evidence as to the manner in which the United Kingdom and the People's Republic will effect all the details of the changes to take place upon the resumption of the exercise of sovreignty in 1997, inquiry into precisely how the United Kingdom will do so is beyond the proper scope of this decision. "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovreign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina, supra*, 536 F.2d at 484–85 (citing *Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933)). Additionally, such an inquiry, unnecessary and unwarranted to begin with, would directly

encroach on the power of the President and the Senate to make treaties, raising potential problems under the political question doctrine enunciated in *Baker v. Carr*, 369 U.S. 186, 211–213, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962). *See Sindona v. Grant, supra,* 619 F.2d at 174; *cf. Shapiro v. Ferrandina, supra,* 478 F.2d at 906 & n. 10.

## VI

### *The Government's Failure to Provide a "Formal" Complaint*

The relators have made much of the government's failure to substitute the complaint for provisional arrest with a "formal" complaint. The Court has been unable to find authority for the proposition that such a substitution is necessary. The courts have consistently held that the complaint "need only be as precise as is necessary to allow a defendant to prepare a defense, or to prevail upon a plea of former jeopardy in case of reindictment." *United States ex rel. Rauch v. Stockinger,* 269 F.2d 681, 688 (2d Cir.), *cert. denied,* 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183 (1959), *reh'g denied,* 361 U.S. 973, 80 S.Ct. 584, 4 L.Ed.2d 553 (1960); *accord Shapiro v. Ferrandina, supra,* 478 F.2d at 898–99. We reject the relators' suggestion that the brief submitted to the Court by the government for use at the evidentiary hearing should be construed as a complaint.

## VII

### *The Petitions for Writs of Habeas Corpus*

Tang and Chan, by their petitions for writs of habeas corpus, contend they are being detained unlawfully and should be released pursuant to 28 U.S.C. § 2241(c). They put forth two grounds. First, they argue that the Complaint cites a 1931 Treaty with the United Kingdom instead of the 1977 Treaty currently in effect. Because the relevant statute, 18 U.S.C. § 3184, requires an extradition treaty or convention between the United States and the foreign government involved, petitioners argue that reference to the abrogated Treaty in the government's complaint renders their continued detention unlawful. This argument is meritless. First, the Statute, by its terms, merely requires that the complaint charge the person to be extradited with having committed any of the crimes provided for by a treaty. Failure properly to refer to the extant treaty does not destroy its existence, and existence of a treaty, not proper reference to it, is the statutory requirement. *Cf. Shapiro v. Ferrandina, supra,* 478 F.2d at 899 (failure of complaint to properly specify *where* relator was "found" within the district did not run afoul of statutory requirements). Petitioners do not contend that they were unaware that the 1977 Treaty applied, or that they were prejudiced by the erroneous citation. Nor could they. The 1977 Treaty is referred to in the United Kingdom's request for their provisional arrest, which was attached to the Complaint. In fact, Tang relied on the 1977 Treaty four days after his arrest in his first set of papers filed with the Court. This type of clerical error would not serve to bar or overturn a conviction for a federal crime, Fed.R. Crim.P. 7(c)(3). Nor will it scuttle an extradition. Erroneous or incomplete complaints have been held sufficient in similar circumstances. *See Shapiro v. Ferrandina, supra,* 478 F.2d at 899–900 (complaint's erroneous statement as to plaintiff's whereabouts); *United States ex rel. Roach v. Stockinger, supra,* 269 F.2d at 687–88 (complaint's lack of specification of overt acts and omission of the words "with intent" not fatal to extradition) (quoting *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) and *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911)); *see also In re Breen, supra,* 73 F. at 459 ("the old doctrine, that proceedings for the extradition of an alien are to be conducted with extreme technicality, has long since been abandoned"). Tang and Chan have not been prejudiced by the error in the Complaint, and they can not at this late date rely on this harmless mistake to their benefit.

As a second ground for their petitions, Tang and Chan state that the time for provisional arrest is limited to 45 days, and the period of their detention has exceeded that. It is true that the Treaty provides a 45 day limit on the period of detention in cases of provisional arrest. Art. VIII, 28 U.S.T. at 232. Provisional arrest is to be used in cases of urgency, as an interim device while a formal request can be prepared by the requesting government. In this case, the requisite urgency was found to exist by Magistrate Dolinger of this District on March 16, 1987. The United Kingdom's formal request, filed in this Court April 17, 1987, made the legality of the provisional arrest moot. Judge Lasker of this Court so held in *United States v. Tang*, 657 F.Supp. 1270, 1271 & n. 1 (S.D.N.Y.1987).

The petitioners have erroneously confused the limit on the time during which persons sought to be extradited may be *provisionally* arrested and detained pending a formal request for their extradition, with a supposed time limit on their detention pending an evidentiary hearing. The 45 day limit restricts the period following the initial arrest of the person sought to be extradited only "if a request for his extradition shall not have been received." Treaty, Art. VIII, 28 U.S.T. at 232. Neither the Treaty nor the statute contains a limit on the time between the formal request and the evidentiary hearing. Totally apart from this, it is noteworthy that every delay in this case had been at the request of the petitioners. They cannot exploit their own delay to defeat extradition. *Cf. In re United States*, 713 F.2d 105, 110 n. 4 (5th Cir. 1983) (delay of extradition pending disposition of relator's appeal does not adversely effect extraditibility despite statute requiring conveyance out of the United States within two months); *accord Matter of Assarsson*, 670 F.2d, 722, 725 (7th Cir.1982); *Jiminez v. United States District Court*, 84 S.Ct. 14, 18, 11 L.Ed.2d 30, 35 (1963) (Goldberg, J., in chambers).

## VIII

### *Conclusion*

The requirements of 18 U.S.C. § 3184 have been met:

(1) A valid treaty exists between the United States and the United Kingdom;
(2) The crimes with which Tang and Chan are charged are provided for by this Treaty;
(3) It is conceded that Tang and Chan are the persons sought to be extradited;
(4) It is conceded that Tang and Chan were found within the Court's jurisdiction; and
(5) There is probable cause to believe that Tang and Chan committed the crimes with which they have been charged by the Hong Kong authorities.

There are no constitutional impediments to extraditing the relators. They were given sufficient notice and opportunity to be heard. The relators' objections have been reviewed and are found to be without merit.

This Court hereby certifies to the Secretary of State that it has found sufficient evidence to sustain charges 1 through 46 inclusive against Tang and Chan, so that warrants may issue upon the requisition of the proper authorities of the United Kingdom for the surrender of Tang and Chan.

The incarceration of Tang and Chan shall continue until their surrender is made to the proper authorities of the United Kingdom.

SO ORDERED: